In the Matter of LEHIGH VALLEY RAILROAD COMPANY, Debtor.

No. 70–432.

United States District Court, E. D. Pennsylvania.

Jan. 12, 1979.

David C. Toomey, Philadelphia, Pa., for the Trustee, Lehigh Valley R. Co.

Andrew S. O'Connor, Scott J. McKay Wolas, New York City, for Citibank, N. A., as Indenture Trustee.

James F. Gleason, Jr., Morton M. Fry, New York City, for Chemical Bank, as Trustee for the General Consolidated Mortg. (1903) and Lehigh and Lake Erie Mortg. (1907).

Merrill Stone, New York City, for Manufacturers Hanover Trust Co., as Trustee of the Lehigh Valley Terminal Railway Co., First Mortg., dated as of October 1, 1891.

Laurence Z. Shiekman, Philadelphia, Pa., for Consolidated Rail Corp.

Richard R. Bongartz, Westport Harbor, Mich., Carl Helmetag, Philadelphia, Pa., for Trustees of Penn Central Transp. Co.

John N. Schaeffer, Jr., Philadelphia, Pa., for Fidelity Bank.

Douglas G. Sanborn, Trenton, N. J., for State of New Jersey.

Donald F. Luke, New York City, Edward C. Toole, Jr., Philadelphia, Pa., for Committee of Interline Railroads.

Alexander Hemphill, Philadelphia, Pa., for Harold R. Scattergood, et al., Lehigh Valley Harbor Terminal Bondholders.

Bruce C. Fishelman, Jersey City, N. J., for Jersey City, N. J.

John Broadley, Washington, D. C., for United States Government.

John B. Langel, Philadelphia, Pa., for Girard Trust Bank.

INTERIM OPINION

RE: OBJECTIONS OF FIDELITY BANK AND CHEMICAL BANK TO THE PROPOSED AMENDED PLAN OF REORGANIZATION

ORDER NO. 529

FULLAM, District Judge.

The Trustee of the Lehigh Valley Railroad has petitioned the Court for approval of an Amended Plan of Reorganization ("the Plan"). Before reaching a final decision in this matter, I deem it desirable to file this Interim Opinion addressing the objections to the Plan filed on behalf of Fidelity Bank, Indenture Trustee of the Lehigh Valley Consolidated Mortgage (CM) and the Chemical Bank, Indenture Trustee of the Lehigh Valley General Consolidated Mortgage (GCM), for the purpose of inviting the parties to comment upon the Court's analysis of certain issues presented by these objections, and upon the accuracy of the various calculations embodied therein. While this may slightly delay final disposition of the pending petition for approval, it should, in my view, contribute greatly to the quality of the ultimate product.

Both for the purpose of determining the extent to which a given mortgage is fully secured, and for the purpose of distributing the various new securities of the reorganized company, the Plan assigns to retained assets their actual appraised value, on the assumption that these assets will produce that amount in cash pursuant to the Asset Disposition Program; but assigns to the assets which have been conveyed to ConRail only the values estimated by United States Railway Association in the Final System Plan.[1] The Final System Plan values are only a fraction of what the Trustee and other parties to the reorganization believe the conveyed assets will generate for the estate through the mechanism of the Valuation Case litigation, but proponents of the Plan concluded that it was simply not practicable to use any figure other than the Final System Plan figure for the conveyed assets, for purposes of determining the extent to which various creditors' claims should now be regarded as secured.[2]

Under the Plan, the assets securing the various mortgages consist of the principal amount of escrowed cash proceeds from sales of mortgaged assets, the appraised value of retained assets, and the "reduced," USRA-derived, value of conveyed assets.[3] The total of these asset values determines the percentage of the claim which is treated as secured. The secured portion of each

---

1. The Trustee's estimate of net liquidation value of conveyed assets (excluding equipment) is used only as a basis for allocating the USRA valuation among the various mortgages, by means of a percentage formula.

2. The problems associated with attempting to assign specific values to conveyed assets, in advance of termination of the litigation which will determine those values, did not arise in the Penn Central reorganization. In that case, it was reasonable to assume merely that the Valuation Case would produce values sufficient to justify treating all of the secured creditors as fully secured. For the Lehigh Valley, however, that assumption would not be justified. Confronted with the necessity of assigning specific value to the conveyed assets, in order to determine what percentage of each mortgage could safely be regarded as secured, the architects of the Plan were also faced with the realities of the Special Court litigation process. Use of any figure other than USRA's valuation would introduce an element of speculation. More importantly, it would interfere with the Special

Court litigation: use of a conservative figure would tend to establish a "ceiling" on Valuation Case recoveries; use of an optimistic estimate might unfairly inflate claims for secured status; and any attempt to justify the figure chosen might well entail virtually a trial-run of the Special Court litigation itself. Moreover, it would still be necessary to provide a mechanism in the Plan to reflect the actual eventual outcome of the Valuation Case. Put another way, the choice is to use the USRA valuation and design the securities so that a higher recovery is fairly apportioned among the claimants in their order of priority or to use some higher figure and design the securities in such a way that the recipients thereof will be fairly treated if the Valuation Case award is either less than or greater than the estimated recovery. Clearly, the former approach is more feasible.

At issue then, is whether the securities to be issued under the Plan and the scheme for their allocation is such that any recovery in excess of the USRA valuation is fairly and equitably apportioned.

3. See footnote 1.

claim is to be paid, 20% in cash and the balance in First Mortgage Bonds. The unsecured portion of each claim is to be paid by a combination of Second Mortgage Bonds and common stock.[4] The issues being considered in this Opinion concern only the relative distributions of First Mortgage Bonds and Second Mortgage Bonds.

Cash-flow projections indicate that approximately 25% of the First Mortgage Bonds will be redeemed within the next few years from the proceeds of the Asset Disposition Program; the balance of the First Mortgage Bonds, and all of the Second Mortgage Bonds, must look to the outcome of the Valuation Case for payment. Under the Plan, the proceeds of the Valuation Case would be devoted first to the payment of the principal and accrued interest on the Administrative Notes; next to the payment of the principal of the First Mortgage Bonds; next to the payment of contingent interest on the First Mortgage Bonds, at the rate of 7% compounded semi-annually; next to the payment of principal of Second Mortgage Bonds; and thereafter to the payment of contingent interest on the Second Mortgage Bonds. The balance, if any, would go to junior interests.

If the Valuation Case produces a recovery sufficient to assure payment in cash of all of the First and Second Mortgage Bonds and their contingent interest (approximately $60 million base value), creditors receiving Second Mortgage Bonds in payment of their claims will fare as well as those receiving First Mortgage Bonds, and the issues presented by the objections of Chemi-

cal Bank and Fidelity will prove academic. The Plan, however, uses the $20 million base value assumed by USRA in the Final System Plan.[5] If the Valuation Case produces only a $20 million base value recovery, there is again no problem; the objectors concede that, if that proves to be the value of the conveyed assets, it is properly reflected in the distributions proposed in the Plan. But if the recovery falls somewhere between $20 million and $60 million base value, the objectors contend that the Plan will produce an unfair result, primarily because the contingent interest on the First Mortgage Bonds primes both principal and interest on the Second Mortgage Bonds.

Solely for the purpose of illustrating the claimed unfairness, the objectors have presented a series of calculations based upon a hypothetical Valuation Case recovery of approximately $35 million. This figure has been selected because it is at that level of assumed recovery that the claimed unfairness to these objectors is most apparent. For purposes of present discussion, therefore, I shall adopt the same hypothetical illustration. I wish to emphasize, however, that this most assuredly is not to be regarded as a prediction of the outcome of the Valuation Case litigation.[6]

The following chart shows the allocation to each mortgage of security represented by conveyed assets, under the Plan's assumption of a $20 million base value, and under the hypothetical assumption of a $35 million base value recovery:[7]

---

4. The term "unsecured" is used in a special way in this context. The portion of a secured claim which is classified as unsecured is unsecured only because the conveyed assets are taken at a reduced value.

5. For convenience, the USRA valuation of $20.678 million will be referred to as $20 million.

6. At the Plan hearing, for example, the Trustee produced evidence to the effect that, based upon the opinions thus far expressed by the Special Court, the recovery should be more

than double that sum. A base award of approximately $69 million would be required to redeem all of the various debt-type securities contemplated by the Plan. Needless to say, many claims against the Debtor's estate would be satisfied under the Plan by the issuance of common stock, the holders of which would participate in Valuation Case recoveries in excess of $69 million base value.

7. Figures derived from page 1340 of the Appendix. The GCM conveyed asset amount is 51.66% of $12.023 million.

| ($ in thousands) MORTGAGE | CONVEYED ASSETS: PLAN VALUE | CONVEYED ASSETS: $35 MILLION |
|---|---|---|
| LVRR | $ 3,202 | $ 5,419 |
| P&NYC&RR | 2,335 | 3,952 |
| LV Rwy. | 2,090 | 3,537 |
| L&LE RR | 856 | 1,445 |
| LVT Rwy. | 4,026 | 6,814 |
| LVHT Rwy. | 275 | 465 |
| LVRR CM | 276 | 468 |
| LVRR GCM | 3,670 | 6,211 * |

* 51.66% of $12.023 million.

Thus, if the Valuation case should produce the hypothetical $35 million recovery, each mortgage will turn out to have been better secured than the Plan contemplates. Under the Plan, the only benefits to be derived by each mortgage from this improvement in its secured position would be that a correspondingly greater amount of the contingent interest on First Bonds would be paid. Chemical suggests, on the other hand, that the increase in security should be reflected by the conversion of a portion of Second Bonds into First Bonds. Fidelity makes a slightly different proposal along the same lines; for present purposes, discussion will be confined to the Chemical Bank proposal.

To the extent that Second Bonds were to be converted into First Bonds, the amount necessary to pay off the First Bonds with accrued interest would be increased, and the claims of other holders of First Bonds would be diluted. And, needless to say, the rights of the holders of unconverted Second Bonds, as to both principal and contingent interest, would be adversely affected. The impact of acceptance of Chemical Bank's proposed amendment upon particular secured creditors would, of course, vary depending upon the extent to which the claim is secured by conveyed, rather than retained assets.

Accompanying this Opinion is a Technical Appendix which develops a comparison between what the bondholders under each mortgage would receive under the present Plan if the Valuation Case produces a $35 million base-value recovery, and what they would receive if the Plan, for marshalling purposes, had initially assigned a $35 million value to the conveyed assets. This comparison is reflected in the following table:

| ($ in thousands) | VARIANCE IN DOLLARS PAID UNDER PLAN FROM DOLLARS PAID IF $35 MILLION USED IN MARSHALLING ANALYSIS * | | |
|---|---|---|---|
| MORTGAGE | TOTAL $ UNDER PLAN | TOTAL $ PLAN WITH $35 MILL. MAR- SHALLING ANALYSIS | VARIANCE FROM PLAN ** |
| P&NYC & RR | $ 57.5 | $ 52 | $ ( 5.5) |
| LV Rwy. | 18,198 | 16,365 | (1,833) |
| L&LE RR | 3,774 | 3,404 | (370) |
| LVT Rwy. | 11,556 | 10,528 | (1,028) |
| LVHT Rwy. | 8,810 | 8,211 | (599) |
| LVRR CM | 2,543 | 3,527 | 984 |
| LVRR GCM | 16,409 | 23,779 | 7,370 |
| CTN ('75) | 5,689 | 5,131 | (558) |
| 4¾ Note ('70) | 2,412 | 2,177 | (235) |
| CTN ('76) | 5,433 | 4,900 | (533) |
| SCN ('74) | 6,086 | 5,491 | (595) |
| SCTN ('77) | 4,092 | 4,192 | 100 |
| PCC | 9,062 | 8,030 | (1,032) |

* Assume $35 million base award on December 30, 1987.

** Figures taken from pp. 1344 and 1346 of the Appendix.

Under this analysis, the GCM bondholders represented by Chemical would, in the case of an actual $35 million base value recovery, be assured of receiving some $7.3 million more in cash by the end of the Valuation Case if the Plan's marshalling analysis had assumed that value for conveyed assets at the very outset than they would receive under the present Plan. Chemical Bank has calculated this difference at approximately $15 million. There are two principal reasons for the difference between my computations and those advanced by Chemical, both of which I believe should be aired at this time, so as to invite further comment.

First, I have assumed an 8.5% interest rate on the Administrative Notes, rather than the 7.5% figure used by Chemical. The second, and more substantial, difference has to do with the treatment of the allocation of security to the GCM bonds pledged as collateral for certain claims of the United States Government.

Approximately 51.66% in principal amount of the GCM Bonds are held by the public; the balance are pledged as collateral security for certain pre-bankruptcy claims of the United States Government. These particular Government claims are treated under the Plan the same as any other pre-bankruptcy secured claim; they are not within the scope of the compromise settlement between the Trustee and the Government. The question presented is whether the security coverage of the GCM Bonds should be determined in the same manner for both the publicly held bonds and those pledged as collateral for the Government's claims (i. e., by allocating 51.66% of the assets to the public holders and 48.34% to the pledge), or whether assets should be allocated to the pledged bonds only to the extent necessary to assure full coverage for the Government's claims. I have adopted the former approach, whereas Chemical has adopted the latter.

Assuming a $35 million base value recovery, allocating 48.34% of GCM's conveyed asset values to the pledged bonds would mean that the Government's claims would be over-collateralized by approximately $5.821 million.[8] Chemical's proposal assumes that this excess should be made available to the public holders of GCM Bonds.[9] The calculations set forth in the accompanying Technical Appendix are based upon my tentative conclusion that this surplus should not be allocated to the publicly held GCM Bonds.

There are valid arguments to be made on both sides of this question. If the pledged bonds do not need to be paid in order to satisfy the Government's claims, arguably this simply reduces the total obligations of the Debtor under the mortgage, and leaves the total assets covered by the mortgage available as security for the publicly held bonds remaining outstanding. On the other hand, the pledged bonds are owned by the Debtor's estate; the public holders of GCM Bonds do not have any lien upon the pledged bonds; and the value represented by the pledged bonds, over and above what is needed to satisfy the Government's claims, should benefit the estate as a whole (i. e., junior, unsecured creditors). Because the presentations of the parties do not focus upon this problem, I believe further elucidation should be invited.

The fundamental issue thus far addressed in this Opinion is whether bondholders under mortgages looking substantially to conveyed assets for security are unfairly treated by reason of the fact that, in the marshalling analysis which determines the percentage of the mortgage claim which is deemed fully secured, the conveyed assets as a whole were valued at USRA's figures. It is apparent that there could be no such unfairness if the actual recovery in the Valuation Case does not exceed $20 million base value, or if the actual recovery is in

**8.** Appendix at p. 1341. *See In re Penn Central Trans. Co.*, 458 F.Supp. 1234, 1317 (E.D.Pa. 1978).

**9.** Myer work papers, second tab at pp. 4 and 5.

excess of $60 million base value. The precise issue is whether the Plan is unfair to these mortgagees because it exposes them to the risk that the Plan's marshalling analysis would be detrimentally inaccurate if the Valuation Case recovery falls between $20 million and $60 million base value. In assessing fairness in this context, it is important to quantify the risk as accurately as possible. Because it is not feasible to speculate about the actual Valuation Case award, it is necessary to assume a recovery which would produce the greatest potential for unfairness, i. e., $35 million base value. But even at that level, it is important to ascertain whether the alleged disparity in treatment amounts to $15 million for a particular mortgage, or only $7.3 million.

A second fundamental issue to be addressed at this time is also dependent, in large measure, upon an accurate evaluation of the risks of disparity of treatment of these mortgages. That issue is whether, assuming the marshalling analysis which determines the extent to which particular claims are treated as secured produces potentially unfair results if USRA's figures are used for conveyed assets, the proposals advanced by the objectors represent an effective remedy. For example, if my tentative marshalling analysis is correct at the $35 million base value recovery level, and the discrepancy is $7.3 million rather than $15 million, Chemical Bank's proposed conversion feature would prove overly generous to Chemical's bondholders, since they would then be much better off than they would have been if the hypothetical $35 million base recovery had been known, and used in the marshalling analysis, at the very outset.

For simplicity of analysis, it will be assumed that the conversion of Second Bonds into First Bonds would be *pro rata*, rather than by lot (as proposed by Chemical). A $35 million base value award in the Valuation Case would be $11.86 million in excess of the amount needed to satisfy the Administrative Notes and the principal of the original First Bonds. Converting $11.86 million of Second Bonds into First Bonds would represent a conversion ratio of 38.4%. As applied to the GCM, this would mean that approximately $9.728 million of GCM Second Bonds would be converted to First Bonds, under Chemical's proposal. Thus, adopting Chemical's proposal does not appear to be an appropriate adjustment for the avoidance of the risk presented by the Plan as now formulated, if that risk is only $7.3 million. It should also be noted that, under Chemical's proposal, conversion of $11.86 million of Second Bonds into First Bonds would mean that, at a $35 million level of recovery, each holder of a First Bond, whether issued originally or through conversion, would receive payment of approximately 38% of the accrued contingent interest, whereas, if the Plan remains unchanged, the holders of First Bonds (all originally issued) would receive approximately 77% of the contingent interest thereon.[10]

The computations set forth in the Appendix are based upon an interpretation of ¶¶ 2 and 3 of Article 4.2 of the Plan as meaning that, when a First Bond is redeemed from ADP proceeds, the bondholder would thereafter retain the right to receive accrued contingent interest up to the date of redemption. Chemical's analysis apparently proceeds on the assumption that redeemed bonds would not have any residual right to receive accrued contingent interest. Whichever interpretation represents the true intent of the proponents of the Plan, the language of the Plan should be clarified to reflect it. The difference between the two interpretations could be as much as $5 million.[11]

---

10. Appendix at pp. 1346, 1347.

11. A further point, which affects the Plan generally, and not just the objections of Fidelity and Chemical discussed in this Opinion, should also be clarified. I question whether the Plan contains adequate provisions to deal with the related problems of fractional shares of stock, and of the need for a method of satisfying that portion of a claim which cannot be satisfied by the issuance of a bond in the denominations contemplated by the Plan.

By responding to the Court's invitation to comment upon the matters thus far discussed, counsel will greatly aid the Court in arriving at an accurate assessment of the risks of unfair treatment to which their respective mortgages would be exposed in the event of particular levels of recovery in the Valuation Case. I should like also to invite further comments addressing the overall issue of whether, under the circumstances of this case, a Plan which does have that risk with respect to mortgages largely secured by conveyed assets is necessarily unfair or violative of the Absolute Priority Rule. These issues have, of course, already been addressed in a general way in the briefs and arguments of the parties, but I am inclined to believe that more sharply focused consideration would be desirable. The discussion which follows is intended to outline a possible approach to the problem, and to invite criticism of that approach.

Ordinarily, both in § 77 reorganizations and in other corporate reorganizations, the extent to which a particular claim is secured can be determined with finality as of the consummation date, because the value of the assets securing the claim can be determined as of that date. Because of the RRRA process, the value of Lehigh's conveyed assets simply cannot be determined at this time, and will not be known until the outcome of the Valuation Case. In the Penn Central proceeding, it was reasonable to assume that all mortgages were fully secured. With respect to this aspect of the two cases, therefore, the problem in the Penn Central case was confined to insuring that the ultimate Valuation Case award, whatever it might be, would be properly reflected in the securities of the new company and would be appropriately distributed. The Lehigh Valley case, on the other hand, presents the additional complication discussed above, namely, the need to determine the extent of security, notwithstanding the impossibility of determining with assurance what percentage of particular mortgages is actually secured.

There are various possible ways of dealing with this problem. One approach, adopted by the Trustee's Plan, is to treat as secured only that percentage of a mortgage which is most assuredly secured as of the consummation date; to treat the balance of the mortgage claim as unsecured; and to correct for any errors in the security determinations, if the actual Valuation Case award later establishes that the mortgage was better secured than was originally anticipated, by the issuance of intermediate debt securities payable from the additional proceeds of the Valuation Case.

Another approach, more or less represented by the Chemical and Fidelity proposals, is to attempt to provide a mechanism which would have the effect of retroactively determining, when the Valuation Case is concluded, the actual security coverage of each mortgage, and, without attempting to undo any intervening distributions under the Plan, thereafter treat each mortgage claim appropriately.

The Plan approach has the advantage of being more nearly consistent with traditional reorganization practice, in that it assigns security values as of consummation date. But it is vulnerable to the criticism that it disregards security values which everyone knows really exist at consummation date, because of the fortuitous circumstance that USRA placed an unrealistically low value on conveyed assets, and because it is impossible to determine how much real security value is being disregarded.

The objectors' proposals, on the other hand, are vulnerable to the criticism that they tend to treat potential security values, not clearly identifiable as of consummation date, virtually the same as security values known and ascertained as of that date. Moreover, there is room for argument that implementation of the objectors' proposals, particularly those of Fidelity, might result in impaired marketability of the securities of the reorganized company, because of the many complications and uncertainties involved.

Whatever approach is to be adopted, it is necessary to make certain that it is consistent with the implications of the Absolute

Priority Rule. In this context, I am inclined to believe that this requires careful consideration of the passage of time and the running of interest. Everyone agrees that any reorganization plan for the Lehigh Valley will be akin to an orderly liquidation. To the extent that a claim is a secured claim, it bears interest to the date of payment. The security values recognized by the Plan are determined as of April 1, 1976. Interest on secured claims, for purposes of determining the amount of the claim, runs to July 1, 1978. If this were an actual liquidation (*i. e.,* if the proceedings were to be dismissed, without a Plan, followed by a reasonably orderly liquidation), interest on the secured portion of each mortgage would run, at the contract rate, until the claims were paid. The contract interest accrued after the Plan cut-off date would have a priority claim, to the extent necessary, to any increase in the value of the conveyed assets securing each mortgage resulting from a Valuation Case award in excess of $20 million. Since under the Plan approximately 35% of the secured portion of the various mortgages would be paid, over a relatively brief span of time, from the cash on hand and the ADP Program proceeds,[12] the remaining 65% may be viewed as being satisfied from a liquidation which will be completed only in the more distant future. The Plan takes account of this time delay by according the First Bonds a 7% contingent interest rate which primes the principal and interest of the Second Bonds. It is also appropriate to point out that the conveyed assets securing each mortgage, at either the value used in the Plan or the value derived from the actual Valuation Case award (when that is known), will generate interest at the rate of 8% compounded annually, by way of the Certificates of Value.

From the foregoing observations concerning the time delay and interest rates, it appears to follow that there is at least a difference in degree between presently ascertainable security value and the potential security value represented by the probability that the Valuation Case award will exceed $20 million base value. Is not the Plan provision giving the 7% contingent interest on the First Bonds (which represent the known security value) priority over the principal and contingent interest on the Second Bonds (which represent the potential security value) a reasonably fair method of compensating the claims now known to be secured for the delay in payment and for the cut-off of contract interest on their claims, and of apportioning the benefit of the 8% interest rate on the Certificates of Value? Stated otherwise, the question is whether the differential in access to Valuation Case proceeds between First and Second Bonds and their respective contingent interest is an appropriate way to recognize the difference between known security and potential security.

An Order will be entered inviting further comment and argument upon the issues referred to in the foregoing Opinion.

## TECHNICAL APPENDIX

### EXPLANATION

The primary purpose of this Appendix is to generate a comparison of the total dollars the CM and GCM bondholders will receive if the Plan is consummated as proposed and a $35 million Valuation Case recovery is obtained versus what the result would be if the marshalling analysis incorporated $35 million as the value of the conveyed assets and an award in that amount is obtained.

Part I consists of six steps resulting in the securities distribution which results from the incorporation of $35 million in the marshalling analysis. The method employed is not as detailed as that contained in the Trustee's submission. The increment in the value of the conveyed assets securing each mortgage if a $35 million recovery is

12. For purposes of this analysis (only), it is helpful to ignore the fact that, absent the compromises embodied in the Plan, neither cash on hand nor the proceeds from liquidation of retained assets would actually be available to pay mortgage claims.

obtained is calculated and assigned to each mortgage. Excess security is then determined and marshalled. Next, the GCM assets are allocated among the public holders and the Government issues. The resulting security coverages are applied as per the Plan to the 1978 claim and the distributions under the Plan calculated. The final aspect of Part I is a comparison of the Plan distributions with the distributions which result if $35 million is used in the marshalling analysis.

Part II calculates the payout under the Plan if an award of $35 million is received, and Part III does the same for the securities distribution if $35 million is used in the marshalling analysis.

Part II has four steps and a concluding summary of the payout. First, the contingent interest on the First Bonds is calculated. The contingent interest is then included in step 2 which relates the claims of the various securities to the base Valuation Case award necessary to satisfy the claims of the various securities. Next, the amount of the proceeds available from the $35 million base award are calculated, and the amount of the excess over the total claim of

the Administrative Notes and the principal of the First Bonds is computed and assigned to the contingent interest claim of the First Bonds. Next, the funds available to pay contingent interest are assigned to each mortgage. This last step is a bit complicated because, if the Plan is consummated, early redemption of First Bonds would be by lot. Reflecting this fact in the analysis is not possible. Contingent interest is, therefore, assigned to each mortgage based on the percentage which the amount of First Bonds issued to each mortgage bears to the total amount of First Bonds issued. The total satisfaction is then determined by adding the cash paid on consummation, the full amount of the First Bonds issued to each mortgage, and the contingent interest assigned to each mortgage.

Part III follows the same method, but it is applied to the securities distribution based on the use of $35 million in the marshalling analysis.

Part IV is unrelated to the first three parts and contains the calculation of the implementation of the Chemical conversion formula if a $35 million base award is obtained.

## TABLE OF CONTENTS

### PART I

Calculation of Allocation of Valuation Case Award in Excess of USRA Value ......... 1340
First Lien Security Coverage $35 Million Valuation Case Award ........................ 1340
Marshalling of Excess Security ................................................. 1341
Allocation of LVGCM Assets Among Holders of Bonds .............................. 1341
Application of Security to United States Issues .................................... 1341
Calculation of Changes in Security Distribution if $35 Million Valuation Case Award ....... 1342
Comparison of Plan Distribution to Distribution if Valuation Case Award $35 million ....... 1342

### PART II

Calculation of Contingent Interest Accrual Through December 31, 1987, on Securities Issued under Plan ................................................................. 1342
Securities Issued and Outstanding: Valuation Case Award Necessary to Satisfy as of December 31, 1987 ................................................................. 1343
Amount Available to Satisfy Contingent Interest Under Plan ......................... 1343
Factors for Allocation of Contingent Interest ...................................... 1343
Satisfaction as of December 31, 1987, of Securities Issued under Plan if Valuation Case Award is $35 Million ............................................................. 1344

## PART III

Calculation of Contingent Interest Accrual Through December 31, 1987, on Securities Issued under Plan if $35 Million Valuation Case Award Used in Marshalling Analysis . . . . . . . . . . 1344

Valuation Case Award Necessary to Satisfy Securities Issued and Outstanding December 31, 1987, if $35 Million Used in Marshalling Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1344

Amount Available to Satisfy Contingent Interest if $35 Million Valuation Case Award is Used in Marshalling Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1345

Factors for Allocation of Contingent Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1345

Satisfaction as of December 31, 1987, of Securities Issued under Plan if $35 Million Valuation Case Award is Used in Marshalling Analysis and Award in that Amount is Obtained . . . . . . 1346

## PART IV

Application of Chemical's Conversion Formula . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1346

### CALCULATION OF ALLOCATION OF VALUATION CASE AWARD IN EXCESS OF USRA VALUE

1. Assume award on 12/31/87 of     $35,000,000
2. Calculate increment over USRA value     (20,678,355)

                                             $14,321,645

\* \* \* \* \*

3. Calculate increment as a % of Trustee's valuation     $\frac{14,321,645}{57,332,922} = 24.98\%$

4. Multiply percentage by the Trustee's valuation for each mortgage

| Mortgage | Trustee's Valuation | × | Factor | = | Share of Increment |
|---|---|---|---|---|---|
| LVRR | $ 8,877,969 | | .2498 | | $2,217,716 |
| P&NYC&RR | 6,474,893 | | " | | 1,617,428 |
| LV Ry | 5,793,519 | | " | | 1,447,221 |
| L&LE RR | 2,384,281 | | " | | 593,095 |
| LVT Ry | 11,162,837 | | " | | 2,788,476 |
| LVHT Ry | 762,289 | | " | | 190,701 |
| LVRR CM | 767,418 | | " | | 191,401 |
| LVRR GCM | 19,694,916 | | " | | 4,919,790 |
| None | 1,424,800 | | " | | 355,915 |

### FIRST LIEN SECURITY COVERAGE $35 MILLION VALUATION CASE AWARD

(in thousands)

| Mortgage | Assets | Share of Increment | Total Security | Claim | % Secured | Excess | Deficit |
|---|---|---|---|---|---|---|---|
| LVRR | $ 6,145 | $2,217.716 | $ 8,362.716 | $ 4,982 | 167% | $3,381 | |
| R&NYC &RR | 4,800 | 1,617.428 | 6,417.428 | 37 | 17,343 | 6,380 | |
| LV Rwy. | 11,149 | 1,447.221 | 12,596.221 | 11,693 | 107 | 903 | |
| L&LE RR | 4,289 | 593.095 | 4,882.095 | 2,426 | 201 | 2,456 | |
| LVT Rwy. | 7,197 | 2,788.476 | 9,985.476 | 7,452 | 133 | 2,533 | |
| LVHT Rwy. | 5,626 | 190.419 | 5,816.419 | 6,253 | 93 | | (437) |
| LVRR CM | 468 | 191.701 | 659.701 | 2,511 | 23 | | (1,851) |
| LVRR GCM | 13,943.737 | 4,919.790 | 18,863.427 | 52,550 | 36 | | (33,687) |

## MARSHALLING OF EXCESS SECURITY

(in thousands)

| Mortgage | Excess | |
|---|---|---|
| LVRR | $3,381 | to LVCM |
| LV CM | 1,530 | to LVGCM (LVCM deficit ($1,851) plus $3,381 equals excess of $1,530) |
| P&NYC RR | 6,380 | to LVGCM |
| L&LE RR | 2,456 | to LV Rwy. |
| LV Rwy. | 3,359 | to LVGCM (LV Rwy. excess of $903 plus $2,456 from L&LE RR) |
| LVT Rwy. | 2,674 | to LVGCM (LVT Rwy. excess of $2,533 plus $141 from Brewers Dry Dock) |

* * * * * * * * * * * * * * *

## SUMMARY OF CHANGES IN SECURITY COVERAGE

| | Deficit | Subordinate Lien | Excess/Deficit | Security Coverage |
|---|---|---|---|---|
| LVHT | ($437) | $ 0 | ($437) | 93% |
| LVCM | (1,851) | 3,381 | $1,530 | 100 |
| LVGCM | (33,687) | 13,943 | (19,744) | 62 |

## ALLOCATION OF LVGCM ASSETS AMONG HOLDERS OF BONDS

| MORTGAGE | % of BONDS | SHARE LVGCM ASSETS |
|---|---|---|
| LVGCM-Public | 51.66% | $16,948 |
| CTN (75) | 12.37 | 4,058 |
| 4¾ Note (70) | 13.32 | 4,370 |
| SCN (74) | 19.03 | 6,243 |
| CTN (76) | 3.62 | 1,188 |

Formula: Total assets, $32,807 × % *

* First lien security of $18,864 plus second lien security of $13,943.

## APPLICATION OF SECURITY TO UNITED STATES ISSUES

(in thousands)

| Issue | Claim | Other Security | LVGCM Security | Total Security | % Secured | Excess | Subordinate Claim |
|---|---|---|---|---|---|---|---|
| CTN (75) | $3,587.243 | $4,982 (LVRR) | $4,058 | $ 9,040 | 251% | $5,453 | CTN (76) |
| 4¾ Note (70) | 1,521.315 | 0 | 4,319.892 | 4,369.8 | 287 | 2,840 | CTN (76) |
| SNC (76) | 3,839.583 | 283.587 (Escrow) | 6,243.172 | 6,526.8 | 170 | 2,687 | CTN (76) |
| CTN (76) | 3,424.925 | 5,453 (CTN 75) 2,849 (4¾ N) 2,687 (SNC 76) | 1,188 | 12,177 | 355 | 8,752 | SCN (77) |
| SCTN (77) | 2,930.003 | 8,752 (CTN 76) | 0 | 8,752 | 298 | 5,821 | None |

## CALCULATION OF CHANGES IN SECURITY DISTRIBUTION IF $35 MILLION VALUATION CASE AWARD

| | Claim 7/1/78 | % Secured | Secured Portion 20% cash | Secured Portion 80% First Bonds | Unsecured Portion Second Bonds | Unsecured Portion Shares of Stock |
|---|---|---|---|---|---|---|
| LVT Ry. | $ 8,096 | 100% | $1,619.2 | $ 6,476.8 | — | — |
| LVHT | 6,789 | 93 | 1,262.8 | 5,051.2 | 475 | 2,375 |
| LVCM | 2,712 | 100 | 542.4 | 2,169.6 | — | — |
| LVGCM | 36,716 | 49.87 | 3,656.9 | 14,627.6 | 18,431.4 | 92,157 |
| SCTN 77 | 2,930 | 100 | 567 | 2,270 | — | — |

\* 16,948 ÷ 34,056 = 49.8%

## COMPARISON OF PLAN DISTRIBUTION TO DISTRIBUTION IF VALUATION CASE AWARD $35 MILLION

(Dollars in thousands)

| | Claim 7/1/78 | Plan Distributions Cash | Plan Distributions First | Plan Distributions Second | Plan Distributions Shares of Stock | Distributions Based on $35 million award Cash | Distributions Based on $35 million award First | Distributions Based on $35 million award Second | Distributions Based on $35 million award Shares of Stock |
|---|---|---|---|---|---|---|---|---|---|
| LVT Ry. | $ 8,096 | $1,603 | $ 6,412 | $ 81 | 405 | $1,619.2 | $ 6,476.8 | — | — |
| LVHT | 6,789 | 1,222 | 4,888 | 679 | 3,395 | 1,262.8 | 5,051.2 | $ 475 | 2,375 |
| LVCM | 2,712 | 353 | 1,410 | 949 | 4,745 | 542.4 | 2,169.6 | — | — |
| LVGCM | 36,716 | 2,276 | 9,106 | 24,334 | 126,670 | 3,656.9 | 14,627.6 | 18,431.4 | 92,157 |
| SCTN (77) | 3,224 | 567 | 2,270 | 387 | 1,935 | 645 | 2,579 | | |
| | | 6,021 | 24,086 | 27,430 | 135,215 | 7,726 | 30,904 | 18,906.4 | 94,532 |

Changes in total cash and securities to be used.

| | |
|---|---|
| Cash: | $1,705 |
| First Bonds | 6,818 |
| Second Bonds | (8,524) |
| Shares of stock | (40,683) |

## CALCULATION OF CONTINGENT INTEREST ACCRUAL THROUGH DECEMBER 31, 1987, ON SECURITIES ISSUED UNDER PLAN

1. Unredeemed First Bonds

| | |
|---|---|
| Issued: | $53,083 |
| Redeemed: | 17,410 |
| Balance | $35,673 |

7% Interest CSA

Factor .9225 × $35,673 = $32,908

2. Redeemed First Bonds at 7% Interest CSA

| Amount Redeemed | Period Outstanding | Cont. Int. Accrued |
|---|---|---|
| $2,234 | .5 years | $ 78 |
| 4,566 | 1.5 | 496 |
| 6,104 | 2.5 | 1,145 |
| 821 | 3.5 | 223 |
| 99 | 4.5 | 35 |
| 84 | 5.5 | 38 |
| 3,502 | 9.5 | 3,230 |
| | | $5,245 |

3. Total Contingent Interest Accrued

$32,908 plus $5,245 equals $38,153

## SECURITIES ISSUED AND OUTSTANDING: VALUATION CASE AWARD
## NECESSARY TO SATISFY AS OF DECEMBER 31, 1987

| (in thousands) | PRIN. | INT. | TOTAL | CUM. TOTAL | RANGE OF BASE VALUES AS OF APRIL 1, 1976 |
|---|---|---|---|---|---|
| Series A Admin. Notes (8½%) | $6,291 | $10,181 | $13,872 | | $ 0 – 5,615.8 |
| Series B Admin. Notes (8½%) | 3,445 | 4,152 | 7,597 | $ 21,469 | 5,615.8 – 8,619.6 |
| First Bonds | 35,673 * | ** | 35,673 | 57,142 | 8,619.7 – 23,132.7 |
| | | 38,153 | 38,153 | 95,295 | 23,132.8 – 38,578.1 |
| Second Bonds | 30,845 | | 30,845 | 126,140 | 38,578.1 – 51,065 |
| | | 28,454 | 28,454 | 154,594 | 5,1065.1 – 62,584 |
| Preferred A—92,080 shs. | 9,208 | | 9,208 | 163,802 | 62,584.1 – 66,311.7 |
| Preferred B—65,878 shs. | 6,588 | | 6,588 | 176,390 | 66,311.8 – 68,978.7 |

* $53,083 million issued less maximum forecasted redemption of $17.410 million.
** Calculation of the contingent interest accrued is on page 1342.

## AMOUNT AVAILABLE TO SATISFY CONTINGENT
## INTEREST UNDER PLAN

(in thousands)

| | |
|---|---|
| Base Award 4/1/76 | $35,000 |
| Base Award at 8% CA | 86,456 |
| Amount to Satisfy Admin. Notes and Principal of First Bonds | (57,142) |
| Balance | $29,314 |

## FACTORS FOR ALLOCATION OF CONTINGENT INTEREST

| Mortgage | First Bonds | % First Bonds of Total | Share of Cont. Int. |
|---|---|---|---|
| P&NYCSRR | $ 32 | .0006 | $ 17.5 |
| LV Rwy. | 10,098 | .1902 | 5,575 |
| L&LE RR | 2,094 | .0394 | 1,156 |
| LVT Rwy. | 6,412 | .1208 | 3,541 |
| LVHT Rwy. | 4,888 | .0921 | 2,700 |
| LV RR CM | 1,410 | .0266 | 780 |
| LVRR GCM | 9,106 | .1715 | 5,027 |
| CTN (75) | 3,158 | .0595 | 1,744 |
| 4¾ Note (70) | 1,339 | .0252 | 738 |
| CTN (76) | 3,014 | .0568 | 1,665 |
| SCN (74) | 3,378 | .0636 | 1,864 |
| SCTN (77) | 2,270 | .0428 | 1,255 |
| PCC | 5,838 | .11 | 3,224 |
| Total | $53,083 * | | |

* First Bonds in the amount of $46 are not included in the tabulation but are in the total.

Formula:  Amount issued per mortgage

   Total issued

   Assume amount of contingent interest $29,314.

SATISFACTION AS OF DECEMBER 31, 1987, OF SECURITIES ISSUED UNDER
PLAN IF VALUATION CASE AWARD IS $35 MILLION

|              | CASH    | FIRST   | CONT. INT. | TOTAL     |
|--------------|---------|---------|------------|-----------|
| P&NYC & RR   | $    8  | $    32 | $   17.5   | $    57.5 |
| RV Rwy.      | 2,525   | 10,098  | 5,575      | 18,198    |
| L&LE RR      | 524     | 2,094   | 1,156      | 3,774     |
| LVT Rwy.     | 1,603   | 6,412   | 3,541      | 11,556    |
| LVHT Rwy.    | 1,222   | 4,888   | 2,700      | 8,810     |
| LVRR CM      | 353     | 1,410   | 780        | 2,543     |
| LVRR GCM     | 2,276   | 9,106   | 5,027      | 16,409    |
| CTN ('75)    | 789     | 3,156   | 1,744      | 5,689     |
| 4¾ Note ('70)| 335     | 1,339   | 738        | 2,412     |
| CTN ('76)    | 754     | 3,014   | 1,665      | 5,433     |
| SCN ('74)    | 844     | 3,378   | 1,864      | 6,086     |
| SCTN ('77)   | 567     | 2,210   | 1,255      | 4,092     |
| PCC          | ——      | 5,838   | 3,224      | 9,062     |

CALCULATION OF CONTINGENT INTEREST ACCRUAL THROUGH
DECEMBER 31, 1987, ON SECURITIES ISSUED UNDER PLAN
($ in thousands)   IF $35 MILLION VALUATION CASE AWARD USED IN MAR-
SHALLING ANALYSIS

1. Unredeemed First Bonds

    Issued:    $59,901
    Redeemed:   17,410

    Balance    $42,491

    7% Interest CSA

        Factor .9225 × $42,491 = $39,197

2. Redeemed First Bonds at 7% Interest CSA

| Amount Received | Period Outstanding | Cont. Int. Accrued |
|-----------------|--------------------|--------------------|
| $2,234          | .5 years           | $    78            |
| 4,566           | 1.5                | 496                |
| 6,104           | 2.5                | 1,145              |
| 821             | 3.5                | 223                |
| 99              | 4.5                | 35                 |
| 84              | 5.5                | 38                 |
| 3,502           | 9.5                | 3,230              |
|                 |                    | $5,245             |

3. Total Contingent Interest Accrued

    $39,197 + $5,245 = $44,442

VALUATION CASE AWARD NECESSARY TO SATISFY SECURITIES ISSUED AND
OUTSTANDING DECEMBER 31, 1987 IF $35 MILLION USED
(in thousands)                IN MARSHALLING ANALYSIS

|                              | PRIN.    | INT.      | TOTAL     | CUM. TOTAL | RANGE OF BASE VALUES AS OF APRIL 1, 1976 *** |
|------------------------------|----------|-----------|-----------|------------|----------------------------------------------|
| Series A Admin. Notes (8½%)  | $ 6,291  | $ 10,181  | $ 13,872  |            | $      0 –   5,615.8                          |
| Series B Admin. Notes (8½%)  | 3,445    | 4,152     | 7,597     | $ 21,469   | 5,615.8 –   8,619.6                           |
| First Bonds                  | 42,491 * | **        | 42,491    | 63,960     | 8,619.7 – 25,892.6                           |
|                              |          | 44,442    | 44,442    | 108,902    | 25,892.9 – 44,087                            |

### VALUATION CASE AWARD NECESSARY TO SATISFY SECURITIES ISSUED AND OUTSTANDING DECEMBER 31, 1987 IF $35 MILLION USED IN MARSHALLING ANALYSIS

(in thousands)

| | PRIN. | INT. | TOTAL | CUM. TOTAL | RANGE OF BASE VALUES AS OF APRIL 1, 1976 *** |
|---|---|---|---|---|---|
| Second Bonds | 22,321 | | 22,321 | 130,724 | 44,087.1 – 52,920.8 |
| | | 20,591 | 20,591 | 151,315 | 52,920.9 – 61,256.6 |
| Preferred A – 92,080 shs. | 9,208 | | 9,208 | 160,523 | 61,256.7 – 64,984.2 |
| Preferred B – 65,878 shs. | 6,588 | | 6,588 | 167,111 | 64,984.3 – 67,651.3 |

* $59,901 million issued less maximum forecasted redemption of $17,410 million.

** Calculation of contingent interest accrued is on page 1344 of the Appendix.

*** Assumes cash is available to meet the additional $1,705 required in cash distribution. See page 1342 of the Appendix.

### AMOUNT AVAILABLE TO SATISFY CONTINGENT INTEREST IF $35 MILLION VALUATION CASE AWARD IS USED IN MARSHALLING ANALYSIS

($ in thousands)

| | |
|---|---|
| Base Award 4/1/76 | $35,000 |
| Base Award at 8% CA | 86,456 |
| Amount to Satisfy Admin. Notes and Principal of First Bonds | (63,960) |
| Balance | $22,496 |

### FACTORS FOR ALLOCATION OF CONTINGENT INTEREST

| MORTGAGE | FIRST BONDS | % FIRST BONDS OF TOTAL | SHARE OF CONT. INTEREST |
|---|---|---|---|
| P&NYC & RR | $    32 | .00053% | $    12 |
| LV Rwy. | 10,098 | .16858 | 3,792 |
| L&LE RR | 2,094 | .03476 | 786 |
| LVT Rwy. | 6,476.8 | .10813 | 2,432 |
| LVHT Rwy. | 5,051.2 | .08433 | 1,897 |
| LVRR CM | 2,169.6 | .03622 | 815 |
| LVRR GCM | 14,627.6 | .2442 | 5,494 |
| CTN ('75) | 3,158 | .05272 | 1,186 |
| 4¾ Note ('70) | 1,339 | .02235 | 503 |
| CTN ('76) | 3,014 | .05032 | 1,123 |
| SCN ('74) | 3,378 | .05639 | 1,269 |
| SCTN ('77) | 2,579 | .04305 | 968 |
| PCC | 5,838 | .09746 | 2,192 |
| Total | $59,901 | | |

* First Bonds in the amount of $46 are not included in the tabulation but are in the total.

Formula: $\dfrac{\text{Amount issued per mortgage}}{\text{Total issued}}$

Assume amount of contingent interest $22,496.

SATISFACTION AS OF DECEMBER 31, 1987, OF SECURITIES ISSUED UNDER PLAN IF $35 MILLION VALUATION CASE AWARD IS USED IN MARSHALLING ANALYSIS AND AWARD IN THAT AMOUNT IS OBTAINED

| | CASH | INT. | CONT. INT. | TOTAL |
|---|---|---|---|---|
| P&NYC & RR | $ 8 | $ 32 | $ 12 | $ 52 |
| LV Rwy. | 2,525 | 10,098 | 3,742 | 16,365 |
| L&LE RR | 524 | 2,094 | 786 | 3,404 |
| LVT Rwy. | 1,619 | 6,477 | 2,432 | 10,528 |
| LVHT Rwy. | 1,263 | 5,051 | 1,897 | 8,211 |
| LVRR CM | 542 | 2,170 | 815 | 3,527 |
| LVRR GCM | 3,657 | 14,628 | 5,494 | 23,779 |
| CTN ('75) | 789 | 3,156 | 1,186 | 5,131 |
| 4¾ Note ('70) | 335 | 1,339 | 503 | 2,177 |
| CTN ('76) | 754 | 3,014 | 1,132 | 4,900 |
| SCN ('74) | 844 | 3,378 | 1,269 | 5,491 |
| SCTN ('77) | 645 | 2,579 | 968 | 4,192 |
| PCC | --- | 5,838 | 2,192 | 8,030 |

## APPLICATION OF CHEMICAL'S CONVERSION FORMULA

1. Base Award      $35,000
   Admin. Notes with interest    (8,619.6)
   Prin. of First Bond    (14,513.1)\*

   Balance      $ 11,867.3

2. Converstion Amt: $\frac{\$11,867}{30,854} \times \$30,854 =$    11,867

3. Conversion Ratio: $\frac{\$11,867}{30,854} =$   38.4%

4. GCM Share:    $\$25,334 \times .384 = \$9,728$

### Increment in GCM Recovery

5(a) Cont. Int. Accrued
     Original issued First Bonds    $38,153
     Conversion First Bonds
       ($11,867 at 7% (SA))    10,947
       Total Cont. Interest    $46,100

(b) Funds Available to Pay Cont.
     Int.    $29,314 \*\*
       Less Prin. of Conversion
       First Bonds    11,817

       $17,447

(c) Ratio of Avail. Funds to Cont.
     Int.    $\frac{\$17,447}{46,100} = 37.8\%$

(d) GCM Share of Cont. Int. Paid
     (i)   $9,728 at 7% CSA   = $8,974
     (ii)   8,974 x .378   =   3,392

(e) Increment in GCM Recovery
     from Conversion
         First Bonds   $9,728
         Cont. Int.   3,392

         $13,120

## APPLICATION OF CHEMICAL'S CONVERSION FORMULA

### Impact on Holders of Original First Bonds

Assume no conversion.

6(a)  Avail. for Cont. Int.:    $29,314  =  76.8%
      Cont. Int.:              38,153

(b)  % Cont. Int. Recovery No Conversion    76.8%

     % Cont. Int. Recovery If Conversion    37.8%

\* See page 1343, *supra.*

\*\* See page 1343, *supra.*