**In the Matter of LEHIGH VALLEY RAILROAD COMPANY, Debtor.**

**Bankruptcy No. 70–432.**

United States District Court, E. D. Pennsylvania.

April 16, 1982.

See also, D.C., 468 F.Supp. 1331.

Alexander Hemphill, Philadelphia, Pa., for Harold R. Scattergood, et al., Lehigh Valley Harbor Terminal Bondholders.

Bruce C. Fishelman, Jersey City, N. J., for Jersey City, N. J.

John Broadley, Washington, D. C., for United States Government.

John B. Langel, Philadelphia, Pa., for Girard Trust Bank.

David C. Toomey, Philadelphia, Pa., for the Trustee, Lehigh Valley R. Co.

Andrew S. O'Connor, Scott J. McKay Wolas, New York City, for Citibank, N. A., as indenture trustee.

James F. Gleason, Jr., Morton M. Fry, New York City, for Chemical Bank, as trustee for the General Consolidated Mortgage (1983) and Lehigh and Lake Erie Mortgage (1907).

Merrill Stone, New York City, for Manufacturers Hanover Trust Co., as trustee of the Lehigh Valley Terminal Ry. Co. First Mortg., dated as of Oct. 1, 1891.

Lawrence Z. Shiekman, Philadelphia, Pa., for Consolidated Rail Corp.

Richard R. Bongartz, Adamsville, R. I., Carl Helmetag, Philadelphia, Pa., for trustees of Penn Central Transp. Co.

John N. Schaeffer, Jr., Philadelphia, Pa., for Fidelity Bank.

Douglas G. Sanborn, Princeton, N. J., for State of N. J.

Donald F. Luke, New York City, Edward C. Toole, Jr., Philadelphia, Pa., for Committee of Interline Railroads.

## OPINION OF THE COURT APPROVING PLAN OF REORGANIZATION

FULLAM, District Judge.

## TABLE OF CONTENTS

I. *Introduction*

II. *History of the Reorganization Proceedings*

III. *Assets of the Estate*
 A. Retained Assets
 B. The Valuation Case Claim

IV. *Summary of the Plan*
 A. New Securities
 1. Administrative Notes
 2. Refunding Mortgage Bonds
 3. Common Stock
 B. Distribution Under the Plan
 1. Administrative Claims Payable in Cash
 2. Claim of the United States under § 211(h) of the RRRA, and Claims of the States and Local Taxing Authorities
 3. Secured Claims
 4. The Claims of Penn Central
 5. Claims of Unsecured Creditors and Public Stockholders

V. *The Legal Standard for Approval of the Plan*

VI. *Compromises Incorporated in the Plan*
 A. The Claim of the United States under § 211(h) of the RRRA
 B. Claims for State and Local Taxes
 C. Six-Months Priority Claims
 D. Claim of the Law Firm of Lamb & Hutchison, et al.
 E. Claims of ConRail
 F. Claims of Penn Central Corporation
 G. Claims of Secured Creditors

VII. *Significance of the Valuation Case Settlement*

VIII. *Conclusion*

## I. INTRODUCTION

The Order accompanying this Opinion approves the March 5, 1982 Plan of Reorganization for the Lehigh Valley Railroad Company, a debtor in reorganization under § 77 of the Bankruptcy Act since July 24, 1970. A separate Order establishes the timetable and procedure for submitting the Plan to creditors and stockholders for their vote. Once the voting process is completed, a hearing will be held in this Court to determine whether the Plan should be confirmed. If the Plan is confirmed, consummation and distribution will follow promptly.

## II. HISTORY OF THE REORGANIZATION PROCEEDINGS

The Lehigh Valley Railroad Company ("LV") has been in reorganization since July 24, 1970. For many years before that date, LV had been in unsatisfactory financial condition, due in large measure to the general economic decline in the Pennsylvania anthracite region. Continued operation

of the railroad during the late 1960s was possible only because Penn Central Transportation Company ("Penn Central"), which owned 97% of LV's common stock, was required by an order of the Interstate Commerce Commission, imposed as a condition of approval of the merger between the New York Central and the Pennsylvania Railroad, to provide the financial support necessary to enable LV to remain in business as an independent railroad. When Penn Central filed for reorganization on June 21, 1970, the LV reorganization became inevitable.

This Court appointed as Trustees of the LV its president, John Nash, and Robert Haldeman. They faced a formidable task: the LV had not produced income to cover its fixed charges since the late 1950s, its operating revenues were declining, and its supply of freight cars and locomotives was rather modest. On the bright side, its tracks and equipment were in relatively good condition.

During the first two years of reorganization, the Trustees successfully maintained a holding-pattern. They made many improvements throughout the system, and achieved some positive operating results. In their comprehensive report filed in July 1972, the Trustees were generally optimistic about their ability to overcome the setbacks occasioned by Hurricane Agnes (which occurred in June 1972), and their ability to continue operations while they pursued long-term solutions to LV's chronic problems.

In the July 1972 report, the Trustees pointed out the fundamental difficulty confronting all railroads in the north-eastern region of the United States, namely, that the amount of rail traffic which could be generated was inadequate to permit efficient utilization of existing rail facilities. Their conclusion:

"There are two basic methods for improving the financial condition of these carriers. The first method would be to secure sufficient additional traffic to make all the railroads viable. The second method involves a reduction in the number of rail facilities to a level that can be profitably supported by the available traffic.

"Since the Lehigh Valley is unable to attract sufficient additional traffic to its lines within the near future, which will be sufficient to make the railroad viable on its own, the obvious alternative is to engage in a restructuring of the railroad which would result in a reduction in the number of rail facilities to a level which can profitably be supported by the available traffic."

The Trustees proposed an ambitious solution: consolidation of the LV, Reading, and Central Railroad Company of New Jersey into one streamlined system. The Trustees vigorously pursued this proposed consolidation, but their effort had not yet met with success when it was overtaken by larger events.

In February of 1973, Congress directed the Department of Transportation to prepare recommendations for a solution to the overall problems of rail transportation in the Northeast region. In the meantime, during the latter part of 1972 and early 1973, LV's operating results were declining. Within a few weeks after Congress' initial action, the Trustees filed a petition seeking termination of all of LV's rail service. By the time of the hearing on that petition, in June 1973, it was apparent that a legislative solution to the Northeast rail crisis was in the offing, and I therefore deferred ruling on the termination petition.

On January 2, 1974, the Regional Rail Reorganization Act of 1973 ("RRRA" or "Rail Act") became law.[1] After litigation in various forums concerning the constitutionality of the Rail Act, the Supreme Court upheld it.[2] During 1974 and 1975, the Government, acting through the United States Railway Association ("USRA") determined what portions of the LV and other railroads would be conveyed to ConRail, the successor corporation created by the Rail Act to operate a permanent rail system

---

1. 45 U.S.C. §§ 701 et seq.

2. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

derived from the railroads in reorganization in the region. On April 1, 1976, pursuant to the Rail Act, more than 75% of LV's main line rail properties were conveyed to Con-Rail.

For all practical purposes, LV ceased to be an operating railroad as of April 1, 1976, although some segments of LV's retained rail facilities were continued in use under subsidy agreements with state and local governments. After the conveyance the remaining LV Trustee (Mr. Nash having resigned) turned his attention to the formulation of a reorganization plan.

An initial proposed Plan was filed on July 1, 1977. It was based upon certain understandable, but unrealistic, assumptions concerning the permissible treatment of the claims of the United States Government and of Penn Central, LV's two largest creditors. Although no formal proceedings were conducted with respect to this initial proposal, it formed the basis for negotiations between the Trustee and the Government and Penn Central, and led to the filing of an Amended Plan on December 29, 1977. After considering comments received from various interested parties, the Trustee further amended the Plan in March 1978.[3] Hearings on this 1978 Plan were held in the summer of 1978, at which substantial objections were asserted by several parties.

After carefully reviewing the rather complicated financial information submitted by the parties, I concluded that potentially useful formulations of that information were not in the record, and that, in some respects at least, the positions asserted by the parties were not sufficiently related to the factual record. In January 1979, I filed an Interim Opinion expressing certain tentative conclusions with respect to the underlying issues, set forth proposed formulations of the relevant financial information, and invited the parties to comment. 468 F.Supp. 1331. The period for comment on the Interim Opinion was later extended at the request of the parties, and the comments were ultimately filed in March of 1979. Unfortunately, by and large, the comments did not adequately come to grips with the issues addressed in the Interim Opinion.

As discussed in greater detail later in this Opinion, an important issue which had to be resolved by any plan of reorganization was whether the parties to the LV reorganization proceeding would be better served by having LV emerge from reorganization with the capability of using its own net operating loss carry-forwards ("NOL") to shelter future income, or by having the reorganized LV continue as a member of Penn Central's consolidated tax group. The 1978 Plan was geared to the former approach. Although this approach of the 1978 Plan was initially endorsed by everyone, there were second thoughts.

In October of 1979, Penn Central[4] filed a statement suggesting that amendments to the LV Plan would be desirable. After further negotiations, Penn Central filed a formal petition proposing amendments to the Plan in December of 1979, and hearings were held in January 1980. The general thrust of Penn Central's proposed amendments was to revise the distribution of common stock under the LV Plan so as to ensure that the reorganized company would remain part of the Penn Central consolidated tax group. The LV Trustee and other parties opposed Penn Central's proposed amendments.

Throughout this period, the LV Trustee had been exploring the possibility of achieving one or more major corporate mergers or acquisitions which would enable LV to capitalize on the value of its NOLs. By the early spring of 1980, these efforts appeared likely to bear fruit. A potential acquisition had been identified and was being actively pursued. It seemed prudent to delay ruling on the 1978 Plan until the Trustee had

3. The December 1977 Plan, as amended in March 1978, is referred to in this Opinion as the "1978 Plan".

4. The Reorganization Plan of the Penn Central Transportation Company was approved and consummated in October 1978, and the reorganized company, Penn Central Corporation ("Penn Central") succeeded to PCTC's former role in the LV reorganization.

reached a decision on this matter. Ultimately, the contemplated transaction proved unworkable.

On the basis of this experience, the Trustee proposed further amendments to the LV Plan designed to improve the reorganized company's ability to consummate beneficial corporate acquisitions or mergers. These amendments were formally presented on July 28, 1980; the evidentiary record on the proposed amendments was closed in October 1980.

On November 16, 1980, Penn Central reached a settlement with the Government on its Valuation Case litigation in the Special Court. Naturally enough, this prompted the LV Trustee to believe that prompt settlement of the LV Valuation Case litigation would also be possible. In order to simplify the settlement process, the Trustee sought and obtained authority to settle the Valuation Case litigation without the need to obtain further approval by this Court (settlement of the Valuation Case would still require the approval of the Special Court).

Contemporaneously with the announcement of the Penn Central settlement of its Valuation Case claims, the Internal Revenue Service issued a private letter ruling to Penn Central which, if ultimately upheld, would result in income tax consequences from receipt of the Valuation Case proceeds less favorable than the tax consequences originally anticipated. The IRS ruling gave rise to uncertainty as to the validity of the information previously submitted to this Court in connection with the pending proposed amendments to the LV Plan. Accordingly, I entered an Order requiring the parties to update the pertinent financial information. Instead, with this Court's approval, the Trustee and Penn Central reevaluated their respective positions in connection with the pending proposed Plan amendments, and entered upon further negotiations, which led to an overall settle-

ment of their respective claims and contentions. On July 21, 1981, the LV Trustee filed an Amended and Restated Plan of Reorganization,[5] incorporating the new LV-Penn Central settlement.[6]

After due notice, a hearing on the 1981 Plan was held on September 28, 1981. At the hearing, the Trustee proposed certain further amendments to the distribution schedule in order to satisfy objections which had been raised by other parties before the hearing. Most, but not all, of the objectors agreed or conditionally agreed to the proposed new distributions as a satisfactory means of resolving their objections. However, the United States Government continued to press objections to the treatment of some of its claims under the 1981 Plan, claiming violations of the absolute priority rule. These objections were addressed in post-hearing briefs filed by the Government and by the Trustee.

Attempts to resolve the Government's objections to the 1981 Plan through further negotiations were necessarily related to the ongoing negotiations toward possible settlement of LV's Valuation Case claims which intensified during late 1981 and early 1982. On February 25, 1982, the parties announced an agreement in principle for an overall settlement of the Valuation Case and the Plan issues. This settlement necessitated further revisions to the 1981 Plan. These changes, together with a revised version of the settlement agreement between the Trustee and Penn Central, were submitted to this Court for approval on March 5, 1982, and a hearing was held on March 29, 1982, after due notice to all parties. This final version of the Reorganization Plan (referred to herein as "the Plan") is now before the Court for approval.

### III. ASSETS OF THE ESTATE

The LV estate consists of all of its property, both tangible and intangible, remain-

---

5. The July 21, 1981 Plan is referred to in this Opinion as the "1981 Plan".

6. The settlement provided that Penn Central would be the only holder of the common stock of the reorganized LV, the reorganized LV would remain part of the consolidated tax group, Penn Central would pay any LV tax liability arising from receipt of the LV's Valuation Case recovery, and Penn Central's distribution of debt securities would be less than the amount proposed in the 1978 Plan.

ing in the estate after the conveyance to ConRail (the retained assets) and a claim against the United States for the value of the property conveyed to ConRail (the Valuation Case claim).

## A. Retained Assets

### 1. Tangible Assets

Throughout the reorganization proceeding, and at a greatly accelerated pace since the conveyance to ConRail, the Trustee has been selling off real and personal property of the estate, and depositing the proceeds in various escrow accounts. The balance of these escrow accounts, including interest to July 1, 1982, will be approximately $59.15 million.

The estimated value of property remaining unsold is $3.362 million, most of it encumbered by mortgages. There is also approximately $4 million in an escrow account relating to the claims of Penn Central, and an unencumbered working cash balance of approximately $700,000 (as of July 1, 1982).

### 2. Net Operating Losses

In each of the years during reorganization, except 1981, the LV sustained a net operating loss (NOL). These accumulated NOLs represent a significant value, but any attempt to measure their value with precision is doomed to failure, because of legal complexities and uncertainties. It is necessary to consider the legal principles applicable to NOLs in general, special provisions relating to railroads in reorganization under the Rail Act, the pending IRS ruling, and the implications of LV's membership in the Penn Central consolidated tax group.

In general, NOLs have a carry-forward period of either five or seven years, depending upon when they were sustained, and may be used to offset taxable income in those years. If an NOL is not utilized within its carry-forward period, it is no longer available. Generally speaking, NOLs which accrued before 1976 had a five-year useful life, and have no remaining

utility. NOLs which accrued in 1976 or later have a seven-year useful life, and are still available unless they have already been used.[7]

Because LV is a member of the Penn Central consolidated tax group, additional complications arise. In general, the losses and income of the group are consolidated for the purpose of determining the taxable income of the entire consolidated group. Thus, LV's NOLs were and are available to offset income of other group members. For the period 1976 through 1979, LV's NOLs totaled $15.633 million, but $9.807 million of those NOLs have been used ("absorbed") by the Penn Central consolidated group, leaving a balance of $5.82 million. Some or all of this balance may be absorbed by the consolidated group in connection with returns for the years 1980 and thereafter, and there may be adjustments to previously filed tax returns of the consolidated group, so the actual amount of LV's NOLs which can be considered still available is impossible to determine.[8]

A special provision of the Internal Revenue Code applicable to railroads which transferred their property to ConRail, § 374(e), permits a transferor railroad to utilize expired NOLs to offset income derived from receipt of the award or settlement of the Valuation Case. The LV has at least $20.4 million in NOLs which are subject to this special revival provision. However, under the private IRS letter ruling issued to Penn Central (but warmly disputed by Penn Central and LV), only that part of the settlement or award representing the value of the conveyed property on April 1, 1976, in excess of the LV's tax basis may be offset by the revived NOLs. Thus, since the LV's tax basis exceeds the amount of the proposed settlement of the Valuation Case (see discussion in the following section), if the IRS ruling is upheld, the revived NOLs would not be available as an offset against either the Valuation Case recovery or interest thereon.

---

7. The Economic Recovery Tax Act has extended the carryover period to 15 years.

8. Litigation initiated by the LV Trustee arising from the Penn Central's absorption of the LV's NOLs is discussed in connection with the Penn Central settlement. *See* p. 993, *infra*.

Because of the many variables involved, it is impossible to quantify the economic value of LV's NOLs, except to state that they are an asset of potential value, and form an important and integral part of the overall evaluation of the LV estate.

### B. *The Valuation Case Claim*

Under the RRRA, the compensation due LV for the transfer of its rail property to ConRail is to be determined by litigation in the Special Court. That litigation has been vigorously pursued by the Trustee. It is unnecessary to review here the factual and legal complexities of that litigation. The impossibility of predicting how much the award would be, or when it might be recovered, made previous reorganization planning more difficult.

These uncertainties have now largely been removed. The settlement, assuming its approval by the Special Court, fixes the value of the conveyed property of LV at $47 million as of April 1, 1976. Interest on this amount, compounded annually at 8% pursuant to the Rail Act, will add approximately $28 million as of May 1, 1982, for a total settlement of $75 million as of that date. In addition, the United States will release some $7.078 million in unsecured claims against the LV estate.

### IV. SUMMARY OF THE PLAN

Before reviewing in detail the various securities proposed to be issued, and their distribution in satisfaction of claims against the estate, it should be noted that, if the settlement of the Valuation Case is approved by the Special Court, there will then be a closing at which the agreed amount will be paid in cash. Depending upon when the closing is held, the distribution of securities pursuant to the Plan may be promptly followed by redemption of these securities in cash, or it may be possible to combine the distribution and redemption into a single cash payment in each case. In order to provide adequate flexibility to accommodate the various possibilities, the Plan and the new securities contain the full panoply of covenants and terms necessary to permit consummation of the Plan without regard to the precise timing of the receipt of the Valuation Case proceeds.

### A. *New Securities*

#### 1. *Administrative Notes*

Class A and Class B Administrative Notes are general obligations of the reorganized company, to be issued to the United States and to state and local taxing authorities, respectively. The Administrative Notes will be secured by a first lien on the proceeds of the Valuation Case. If the Valuation Case proceeds are insufficient to satisfy the principal and interest of both classes of Administrative Notes, the notes will have a first lien on the assets of the reorganized company as of the respective dates of maturity of the two classes of Administrative Notes. As between the two classes of Administrative Notes, Class A (to be issued to the United States) will have first priority, as to principal and interest, with respect to both the Valuation Case proceeds and the reorganized company's assets.

The notes will bear interest at the rate of $\frac{1}{8}$ of 1% above the Treasury's cost of borrowing on 10-year direct obligations of the United States issued within 30 days prior to the Plan consummation date (or, if there is no such offering, $\frac{1}{8}$ of 1% above the average yield in the secondary market on such 10-year obligations of the United States). Interest is to be compounded semi-annually on June 30 and December 31 of each year.

Technically, the maturity date of the Administrative Notes is either April 1, 1988, or 90 days after conclusion of the Valuation Case, whichever is later. Under the RRRA, payment for conveyed property is to be made through Certificates of Value, but the certificates are not themselves redeemable as a matter of right until 1987. Thus, the maturity date of the Administrative Notes is linked to the mandatory redemption date of the Certificates of Value. However, the Valuation Case settlement agreement provides that the Certificates of Value will be redeemed in cash on the date of closing. Under the Plan, upon redemption of the Certificates of Value in cash, the Administrative Notes will be redeemed in cash.

Administrative Notes will be issued in multiples of $100, $500 and $1,000 (the balance of any claims not susceptible to payment in those denominations will be paid in cash).

## 2. Refunding Mortgage Bonds

Refunding Mortgage Bonds (Refunding Bonds) will be issued in two series, First and Second. Such bonds bear interest from the date of consummation of the Plan at the rate of 7% compounded semi-annually on June 31 and December 31 of each year, and mature on the later of April 1, 1988, or 12 months after the conclusion of the Valuation Case. Payment of accrued interest on the Refunding Bonds is contingent upon the availability of funds.

The Refunding Bonds are secured by a lien on all available assets of the reorganized company (both retained assets and Valuation Case proceeds) subject only to the first lien of the Administrative Notes on the Valuation Case proceeds, and the potential first lien of the Administrative Notes on the assets of the reorganized company as of the redemption date of the Administrative Notes. Until the redemption of the Administrative Notes, proceeds from sales of retained property, and income derived therefrom, constitute Asset Disposition Proceeds which must be applied at least annually to redeem the Refunding Bonds.

In general, the First Bonds have priority over the Second Bonds. Asset disposition proceeds (ADP) available for the early redemption of Refunding Bonds must first be applied to redeem First Bonds at par. Holders of First Bonds selected for early redemption have the choice of tendering their bonds at par, or of retaining their bonds until maturity. (The benefit of not tendering bonds for early redemption is that, at maturity, the contingent interest on the bonds might be paid; the possibility of obtaining contingent interest would be lost by early redemption). At maturity, the Refunding Bonds are to be satisfied in the following order: principal of the outstanding First Bonds; contingent interest on outstanding First Bonds; principal of the outstanding Second Bonds; and contingent interest on the Second Bonds. Regardless of their maturity dates, Refunding Bonds are to be redeemed beginning 90 days after receipt of the proceeds of the Valuation Case in cash or 90 days after the Plan consummation date, whichever is later.

Refunding Bonds will be issued in denominations of $100, $500 and $1,000, or multiples thereof. Fractional interests (i.e., claims not fully satisfied by payment of bonds in the foregoing denominations) will be satisfied at the expiration of one year after consummation date, by a cash payment equal to the then market value of the fractional interest. (Fractional interests where tender does not occur until after the expiration of the one-year period will be treated on the same basis.)

## 3. Common Stock

The Articles of Incorporation of the reorganized company will increase the number of authorized shares of common stock from 1.6 million to 3 million. The stock will be no-par, one vote per share. No dividends may be declared until the Administrative Notes and Refunding Bonds are fully redeemed and all unsecured claims and claims of the public holders of LV stock have been satisfied in cash.

## B. Distributions under the Plan

### 1. Administrative Claims Payable in Cash

Costs of administration (Class A), pre-bankruptcy interline trust claims (Class D), other claims of administration (Class E), and six-months claims (Class F) will be paid in cash. The six-month claims (Class F) and the other claims of administration (Class E) have been resolved by negotiated settlements. (The settlements are discussed, infra, at p. 989).

### 2. Claims of the United States under § 211(h) of the RRRA, and Claims of State and Local Taxing Authorities

The claim of the United States under § 211(h) of the RRRA, and the claims of New Jersey, New York and Pennsylvania

for post-bankruptcy taxes (with interest but without penalty) will be satisfied by the payment of one-half of the claim in cash and one-half in Administrative Notes. The United States will receive Class A Administrative Notes, and the taxing authorities Class B Administrative Notes. With regard to the tax claims, certain deviations have been agreed upon: that portion of New Jersey's claims which would otherwise have been satisfied by distributing $1.6 million in Administrative Notes will be satisfied by conveyance of certain properties. A grade-crossing claim of the State of New York will be satisfied upon payment of $125,000 in cash and distribution of $185,000 in Administrative Notes.

### 3. Secured Claims

The amount of each Class G secured claim is calculated as principal plus interest at the indenture rate until consummation date. Each such claim has been assigned a distribution percentage. Except for claimants under one mortgage, the distribution percentage is 100%, and those claims will be satisfied by payment of 20% in cash and 80% in First Bonds. The remaining mortgage has a distribution percentage of 52%; 52% of the claim under that mortgage will be satisfied by 20% cash and 80% in First Bonds, and the remaining 48% will be satisfied by Second Bonds.

### 4. The Claims of Penn Central

Penn Central's claims are separately classified under Class H. The settlement between Penn Central and the Trustee, discussed below, contemplates that Penn Central's claims, aggregating in excess of $46 million, will be satisfied by payment to Penn Central of the $4 million balance of an escrow fund, and by the issuance of 500,000 shares of LV common stock. Penn Central will be the only shareholder of LV. Of the 3 million authorized shares, Penn Central will retain the 1,475,561 shares it now holds, and will receive the additional 500,000 shares under the Plan.

### 5. Claims of Unsecured Creditors and Public Shareholders

Claims of unsecured creditors are Class I and claims of the public shareholders (40,-562 shares of LV common stock) Class J. Each share of common stock now held by the public will be treated as a claim in the amount of $10. The Plan does not contemplate the issuance of securities to Class I and Class J claimants. These claims will be paid in cash, after the Administrative Notes and Refunding Bonds have been redeemed. The source of payment will be the Valuation Case proceeds and ADP proceeds remaining after redemption of the Administrative Notes and Refunding Bonds and, if necessary, later-received ADP proceeds and working cash. If funds from these sources are insufficient to pay Class I and Class J claims in full, the distribution will be pro rata, and the claims will be cancelled.

## V. THE LEGAL STANDARD FOR APPROVAL OF THE PLAN

This Court's earlier Opinion approving a Plan of Reorganization in the Penn Central case, *In re Penn Central Trans. Co. (Approval Opinion)*, 458 F.Supp. 1234 (E.D.Pa. 1978) discusses in some detail the legal principles which govern a court's decision to approve or reject a reorganization plan. *See, also, In re Penn Central Trans. Co.*, 596 F.2d 1102 (3d Cir. 1979), *cert. denied*, 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1980); *In re N. Y., N. H. & H. R. R. Co.*, 632 F.2d 955 (2d Cir. 1980). Review of these legal principles in this Opinion can therefore be somewhat abbreviated, but it remains necessary to provide a summary in order to inform the persons who will be voting upon the Plan, and to demonstrate the application of these legal principles to the particular circumstances of the LV reorganization.

Under § 77(e) of the Bankruptcy Act, a plan may be approved and confirmed only if it is found to be fair and equitable. In the classic corporate reorganization, determining whether a proposed plan was fair and equitable involved, essentially, determining the going-concern value of the estate, and then deciding whether implemen-

tation of the plan would fairly distribute that value among the various classes of claimants, with due recognition of their respective legal entitlements. But the supplementation of § 77 of the Bankruptcy Act by the RRRA substantially altered this process in the railroad reorganizations to which it applied. While, on the one hand, the RRRA enabled the bankrupt estates to extricate themselves from the burdens and problems associated with providing rail transportation, at the same time it made the formulation of reorganization plans more difficult because neither the value of the assets conveyed to ConRail, nor the timing of receipt of the proceeds of the Valuation Case could be predicted with certainty. As the cases cited above demonstrate, it became necessary to modify the traditional reorganization methodology to accommodate these uncertainties. Various compromises, and compromise-type assumptions, in combination with sophisticated reorganization securities, provided the necessary flexibility.

The prospect of a reasonably prompt settlement of the LV Valuation Case litigation has, as a practical matter, largely removed these uncertainties in the present case. It must nevertheless be recognized that the settlement is still subject to the approval of the Special Court (and it would plainly be inappropriate for this Court to assume what the decision will be), and unforeseen difficulties may yet arise. The LV Plan therefore, quite properly, is designed to be implemented, whether or not the contemplated settlement of the Valuation Case is consummated, and it must be evaluated on that basis. More precisely, the Court must determine whether the Plan would be fair and equitable if the Valuation Case settlement is approved and effectuated, and if it is not.

 Like the Penn Central Plan, the LV Plan now under consideration is properly characterized as a compromise Plan. Compromises embodied in a reorganization plan may be negotiated agreements, proposals of the trustee which are specifically accepted by a claimant, or proposals concerning the treatment of a particular creditor or class of creditors which may or may not be objected to by that creditor or a

member of the class. Whatever its character, each compromise must be evaluated independently by the court to determine "whether the terms of the proposed compromise fall 'within the reasonable range of litigation possibilities'". *In re Penn Central Trans. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979). In evaluating the proposed compromises, the court must be alert to ensure that expedition is not substituted for fairness:

"[The] legitimate contentions may [not] be disregarded. Rather they must be taken into account in determining whether the plan does or does not provide fair and equitable treatment. The issue is not merely whether there are objections to a particular compromise, but whether the objections are persuasive. No one creditor or group of creditors can be permitted to insist upon litigating every contention to finality, if that very process would frustrate a reorganization which is in the best interests of all creditors." *In re Penn Central Trans. Co. (Approval Opinion)*, 458 F.Supp. 1234, 1263 (E.D.Pa. 1978).

It is the plan as a whole which is presented for approval:

"While each compromise settlement, compromise proposal and compromise-type assumption must be evaluated individually, the importance of viewing the plan as a cohesive unit cannot be overemphasized. All of the compromises are closely inter-related. In a very real sense, the plan is the sum of all its compromises. The fairness and equity of the treatment accorded to any class or member thereof must be evaluated in the context of the plan as a whole." 458 F.Supp. at 1262.

The analysis required to determine whether the Plan and its compromises are fair and equitable falls into two categories. First, there are the compromises relating to the status or amounts of claims. By and large, the Court is required to examine the respective contentions of the parties, and to decide whether the agreed solution falls within the range of reasonably probable

litigation results. Second, there are compromises relating to the valuation of the conveyed assets. Here, as noted above, the questions are twofold: Is the treatment accorded the claimant appropriate in light of the uncertainties of the Valuation Case litigation, and is the treatment appropriate in light of the probability that the Valuation Case settlement will be carried out?

## VI. COMPROMISES INCORPORATED IN THE PLAN

### A. *The Claim of the United States under § 211(h) of the RRRA*

The RRRA, as amended and supplemented, contemplated that the bankrupt estates would be responsible for providing rail transportation until ConRail assumed that responsibility on April 1, 1976. Because operating expenses exceeded operating revenues, cash-flow was negative. As the operating successor, ConRail was in the best position to collect accounts receivable, and also needed to be in a position to pay the bills for both pre- and post-conveyance operations, to avoid service disruptions. Accordingly, the RRRA required LV and ConRail to enter into an agency agreement, pursuant to which ConRail collected LV's accounts receivable and applied the proceeds on account of unpaid pre-conveyance operating expenses. Pursuant to § 211(h), the United States Government provided ConRail with the funds needed to meet the short-fall, and has a claim against LV for the amounts thus advanced. With interest to July 1, 1982, the Government's claim under § 211(h) will be approximately $16.16 million.[9]

█ Section 211(h)(5)(B) grants to the United States a first priority administration claim in that amount. The Government and the LV Trustee have agreed, and the Plan provides, that one-half of the Government's § 211(h) claim will be paid in cash on consummation of the Plan, and the balance will be satisfied with Class A Administrative Notes. No one has objected to this

compromise, and I am satisfied that it is in the best interests of the estate.

The compromise is well within the range of probable litigation results. While various parties in these proceedings and in the Penn Central reorganization proceedings have, at times, raised serious constitutional challenges to the Government's claim of super-priority under § 211(h), and have also argued that fairness requires subordination of such claims to the liens of tax claims and/or secured creditors, and that, in any event, no distribution should be made in satisfaction of § 211(h) claims until claims for unconstitutional erosion are finally decided by the Special Court; and while all such arguments are certainly not frivolous, it is obvious that very lengthy and very costly litigation would be required, and that the outcome would be uncertain. From the Government's perspective, on the other hand, the statute is valid and entitles the Government to have its claim paid in full in cash. The compromise represents a reasonable adjustment, and will therefore be approved.

### B. *Claims for State and Local Taxes*

The claims of taxing authorities in New York, Pennsylvania and New Jersey, including interest but without penalty, will total $10.132 million as of July 1, 1982. Under the Plan, these claims are to be satisfied by payment of 50% in cash and the balance in Series B Administrative Notes.

The compromise with the State of New Jersey was approved in Order No. 513. The Plan carries out this compromise, under which real estate valued at $1.6 million is substituted for Administrative Notes in that amount.

The State of New York, including its constituent municipalities, has tax claims aggregating $2.894 million. In addition, the State of New York has a statutory claim for reimbursement of costs associated with elimination of grade crossings in ex-

---

**9.** Included in the Government's claim is an expenditure of $807,422, plus interest, to continue group life insurance for certain of the LV's retired employees. The LV's obligation to reimburse the Government for this cost is in dispute and will be resolved by a separate order of this Court.

cess of $550,000, of which almost one-half is attributable to property conveyed to Con-Rail. A franchise tax liability of $58,000, including interest, is also asserted. Under a compromise arrangement, approved by Order No. 725, New York has withdrawn its objections to the Plan, and has accepted the standard distribution of 50% cash and 50% in Series B Administrative Notes, with respect to the $2.894 million tax claim. The other claims will be satisfied by payment of $154,000 in cash and $214,000 in Series B Administrative Notes. I am satisfied that the settlements with both New Jersey and New York are well within the range of litigation possibilities, and in the best interests of the estate; the previous approvals will not be disturbed.

The Commonwealth of Pennsylvania has neither objected to, nor agreed with, the Plan provisions, but has remained silent throughout all of the proceedings related to the various Plans. The City of Jersey City, New Jersey, vigorously opposed the 1978 Plan, but did not renew those objections at the September 1981 or March 1982 hearings. While it seems probable that the failure of these parties to object could be deemed a waiver of any objections, the fact that Jersey City did timely present objections, and has not withdrawn them, makes it preferable to discuss their merits.

The objection that the Plan recognizes only the principal and interest on tax claims, and disallows all penalties, was rejected in the Penn Central proceedings, *In re Penn Central Trans. Co. (Approval Opinion)*, 458 F.Supp. 1234, 1281 (E.D.Pa.1978), and is rejected here. The same is true of the assertion that tax claims must be satisfied in cash.

Although payment in full in cash is not required, the proposed distributions must satisfy the fair and equitable standard. I have no doubt that the Plan provisions are fair and equitable in this regard. Tax claimants will receive 50% of their claims in cash. Only the § 211(h) claims of the United States share that distinction. The other secured creditors receive only 20% of their claims in cash.

The Series A Administrative Notes which will be issued to the United States have a first lien on the Valuation Case proceeds, but the Series B Administrative Notes to be issued to the tax claimants have a second lien position which is superior to all other securities issued under the Plan. The priority accorded to the Series A Notes is consistent with the statutory lien granted the United States under § 211(h). The interest rate on Series A and Series B Administrative Notes will be the same, and since it is. linked to the Treasury rate, will be substantially in excess of the 7% rate on the Refunding Bonds to be issued to the secured creditors. Moreover, it is a virtual certainty that the Valuation Case award will suffice to satisfy the Series B Administrative Notes and accrued interest thereon, in full, in cash.

It should be noted that, even in the unlikely event that the Valuation Case award does not suffice to satisfy the Administrative Notes in full, the distribution to tax claimants would nevertheless be fair and equitable. Seventy-five percent of LV's rail assets subject to tax liens of the various tax claimants were conveyed to ConRail, and the United States is to issue its Certificates of Value in substitution for those assets. Essentially, what the Plan does is transfer the tax liens on the real estate to the Certificates of Value which will stand in substitution for that real estate. And, although 75% of the property subject to tax liens was "taken" by the United States, the tax claimants bear that burden only to the extent of the 50% of their claims which are to be satisfied by Administrative Notes; and the interest rate on the notes will in all likelihood exceed the 8% interest rate on the Certificates of Value.

■ To summarize, then, the provisions of the Plan with respect to tax claims are legally permissible and represent fair and equitable treatment of those claims.

### C. *Six-Month Priority Claims*

Throughout this proceeding, the Committee of Interline Railroads (the Interlines) has vigorously pressed the contention that

approximately $875,000 in pre-bankruptcy claims of its members must be paid in cash, under the "six-month" rule. The Trustee disputed that contention and, as part of the earlier Plan hearings, the parties presented evidence and fully briefed the issues. On the eve of the September 1981 hearings, the Trustee and the Interlines proposed to settle their differences. The Plan now under consideration conforms to the proposed settlement, by providing that, subject to verification, 50% of the asserted six-month claims will be so classified and paid in cash, and the remaining 50% will be classified as unsecured claims, to be satisfied pro rata along with other unsecured claims, from the funds remaining after redemption of the Administrative Notes and Refunding Bonds.

The verification process will establish the claims which arose within the six-month period preceding the filing of the reorganization petition, and represent claims for supplies or services in support of rail operations. And the record provides a basis for concluding that the Interlines relied on LV's current revenues as a source of payment of such claims. It follows that the Interlines' claims which are verified are such as would be entitled to priority if the other requirements of the six-month priority rule are satisfied.

 Claims which satisfy all of the requirements of the six-month rule have priority over the claims of secured creditors, even though they arose before bankruptcy, and may be satisfied by invading the corpus of the secured creditors' security. In the *Penn Central Approval Opinion, supra,* this Court adopted Judge Anderson's statement of the six-month rule, expressed in *In re N. Y., N. H. & H. R. R. Co.,* 278 F.Supp. 592 (D.Conn.1967), *aff'd,* 405 F.2d 50 (2d Cir. 1968), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1592, 22 L.Ed.2d 776 (1969), and held that the six-month priority should be recognized only when there are post-reorganization revenues in excess of operating expenses (surplus income) or when post-reorganization expenditures benefitting secured creditors exceed depreciation and other reductions in the value of the secured creditors' security (net enhancement).

In the earlier hearings the Interlines sought to demonstrate that there was net enhancement of the LV's secured creditors' position. Central to this contention was the premise that $8.428 million ($3.729 million in interest and $4.699 million in principal) paid by the LV under various equipment obligation contracts should be regarded as expenditures which benefitted the LV's secured creditors. These payments, however, would only benefit the bondholders if the after-acquired property clauses of the mortgages picked up the LV equity in the equipment, and the equipment obligation payments actually resulted in an increase in LV's equity in the equipment. In a different context, this Court estimated that, at most, equity build-up attributable to equipment obligation payments is unlikely to exceed 15%. *See In re Penn Central Trans. Co. (Interim Financing of Operations),* 395 F.Supp. 567, 573 (E.D.Pa.1975). An equity build-up in excess of 75% by reason of such payments would have to occur before the Interlines could succeed under the New Haven standard.

In the Penn Central proceeding, the Interlines appealed from this Court's rejection of their claims to priority. While the appeal was pending, the dispute was settled, on a basis similar to that proposed in this case. In approving the compromise notwithstanding my recent decision adverse to the Interlines, I commented on the disputed legal issues as follows:

"I must recognize, nevertheless, that this issue [the proper formulation of the six-month priority rule] has not been squarely decided by the Third Circuit. While I found decisions from other circuits, particularly the Second Circuit, persuasive, and believe they would be followed in this Circuit, there is room for the possibility that a different view which probably prevails in the Fourth Circuit might be adopted [by the Third Circuit]." *In re Penn Central Trans. Co.,* 458 F.Supp. 1357, 1364 (E.D.Pa.1978).

That observation remains valid. In addition, it should be noted that, in the interim, the Court of Appeals of the First Circuit has adopted a very expansive view of the

six-month rule, holding both that deprecia-
tion should not be taken into account in
calculating net enhancement, and also that
if a six-month creditor actually relied on
the current revenue of the railroad for pay-
ment, rather than on the railroad's general
credit, priority should be accorded even in
the absence of surplus revenues or net en-
hancement. *In re Boston & Maine Corp.*,
634 F.2d 1359 (1st Cir. 1980), *cert. denied*,
450 U.S. 982, 101 S.Ct. 1518, 67 L.Ed.2d 817
(1981).[10] While I remain persuaded that
the Second Circuit approach, espoused by
this Court in the Penn Central proceeding,
is correct, there can be no doubt that the
First Circuit decision supports the Inter-
lines' contentions.

The proposed compromise is within the
range of litigation possibilities, and it is
plainly in the interests of all concerned to
avoid protracted litigation. The compro-
mise of the six-month claims will be ap-
proved.[11]

D. *Claim of the Law Firm of Lamb &
Hutchison, et al.*

The Jersey City law firm of Lamb, Hut-
chison, Chapel, Ryan & Hartung has a claim
in the amount of $135,149.45 for services
rendered before bankruptcy under contin-
gent fee agreements in connection with liti-
gation over property assessments. The law
firm achieved settlements, in 1966 and 1968,
which provided for refunds to LV in excess
of $2 million, payable in installments over a
five-year period. Payment of the law
firm's fee was to be made in installments,
as the refunds were received.

Without notice to the LV Trustee, and in
clear violation of Order No. 1 in these pro-
ceedings, the law firm obtained an order in

a New Jersey court requiring that the 1970
installment due LV in the sum of $400,000
should be made by check payable jointly to
LV and the law firm, and delivered to the
law firm. This Court required the law firm
to endorse and deliver the check to the LV
Trustee, and this turnover Order was af-
firmed by the Third Circuit. *In re Lehigh
Valley R. R. Co.*, 458 F.2d 1041 (3d Cir.
1972).

Initially, the LV Trustee classified this
claim as an unsecured pre-bankruptcy
claim. However, it is conceded that, if the
firm is entitled to a statutory attorney's
lien under N.J.S.A. 2A:13–5, the claim
should be classified as a secured claim. The
law firm contended that it was entitled to
the statutory lien, and also invoked the
equitable benefit doctrine of *Randolph v.
Scruggs*, 196 U.S. 533, 23 S.Ct. 710, 47 L.Ed.
1165 (1903); and further contended that,
since the claim was secured exclusively by
cash, it should be classified as an adminis-
tration claim and paid in cash.

■ After the hearings on the 1981 Plan,
the Trustee and the law firm agreed to
settle the matter by providing that 70% of
the claim ($91,344.08) is to be paid in cash
as a Class E administration claim, and the
balance of the claim is to be cancelled. No
objections to this settlement were ex-
pressed, and the stipulation of settlement
was approved by Order No. 742. The Plan
implements this stipulation. The settle-
ment is within the range of litigation re-
sults and in the best interest of the estate,
and is therefore again approved.

E. *Claims of ConRail*

By Order No. 719, this Court approved a
settlement of a variety of claims asserted

---

10. As I understand the Boston & Maine deci-
sion, the net effect is that six-month claims are
indistinguishable from post-bankruptcy admin-
istration claims. It would seem to follow that
they should be paid during reorganization,
along with other current operating expenses;
and that it should never be necessary to con-
sider whether there are surplus revenues or net
enhancement. I have great difficulty relating
this approach to the accepted notion that ad-
ministration claims are specially treated be-
cause incurred during, and with the protection
of, judicial supervision of the operations.

I also remain unconvinced that the security
of a mortgage is enhanced by expenditures on
the property which do not exceed depreciation.

11. Brewer Dry Dock Co., which is not a mem-
ber of the Committee of Interline Railroads,
also provided services within six months of the
filing of the reorganization petition. By Order
No. 742, this Court approved an agreement
between Brewer and the Trustee pursuant to
which 50% of Brewer's claim will be classified
as an administrative claim and the remainder
as an unsecured claim.

by ConRail against LV, and by LV against ConRail. Pursuant to that agreement, certain claims of each party were cancelled, a substantial escrow fund was paid over to LV, and LV paid ConRail $50,000. The final step in implementing the settlement is the inclusion in the Plan of a $125,000 Class E administrative claim in favor of ConRail.

■ The settlement of these disputes, which arose under the agency agreement mandated by the Rail Act, is well within the range of litigation possibilities, and its consummation is of benefit to the estate.

### F. Claims of Penn Central Corporation

In 1962, the Pennsylvania Railroad acquired 97.3% of the common stock of the LV. LV has always maintained its independent identity as an operating railroad, although it shared certain accounting services with its parent, and the two companies had the same treasurer. When the merger between the Pennsylvania Railroad and the New York Central was being proposed, there was concern in some quarters that the merger might have serious adverse effects upon LV and other railroads with which it connected. Accordingly, in approving the merger in 1966, the Interstate Commerce Commission included condition No. 14, which provides, in pertinent part:

"Until otherwise relieved by this Commission, [Penn Central] shall retain its stock and other holdings to the degree now maintained in the Lehigh Valley Railroad Company and render such support, financial and otherwise, as the Commission, from time to time, may determine necessary to keep such railroad operational." 327 ICC 475, 555 (1966).

The Commission was never called upon to make a determination about the kinds or amount of support to be provided LV by Penn Central, but Penn Central did in fact provide a great deal of support, by permitting interline balances to remain unpaid. From 1967 until LV entered reorganization in 1970, the interline accounts reflected a

balance due Penn Central in the amount of $16.387 million.

Order No. 1 in the LV proceeding required the LV Trustees to pay currently all interline balances except those due Penn Central. With respect to Penn Central, the LV Trustees were authorized, but not required, to make such payments. For the most part, Penn Central's interline balance claims against LV accruing after bankruptcy were not paid. Ultimately, an additional $26.35 million in unpaid interline balances due Penn Central accrued during reorganization. Thus, the total of Penn Central's claims against LV for interline balances is approximately $42.738 million.

In addition to its interline claims, Penn Central has a claim in the amount of approximately $3.77 million based upon its ownership of certain P&NYCRR bonds on which LV is obligated; [12] and Penn Central is the holder of $9.296 million in LV bonds.

Pursuant to a compromise settlement between LV and Penn Central, the Plan provides that, with respect to its $9.296 million of LV bonds, Penn Central will be treated the same as any other such bondholder; and that all of Penn Central's other claims will be satisfied by payment of approximately $4 million in cash from an escrow account, retention of the common stock now held, and the issuance of an additional 500,000 shares of common stock. Because the LV common stock now held by others will be cancelled under the Plan, Penn Central will emerge as the owner of all of the LV common stock.

While there has never been any significant dispute concerning the amounts of Penn Central's claims against LV, there has been a great deal of controversy about the correct characterization of its claims, and their relationship to the claims of other creditors.

Unless one makes the untenable assumption that Penn Central was making a series of gifts to LV, the furnishing of financial

---

**12.** Penn Central purchased at par $2.431 million of the P&NYCRR bonds maturing in 1969; interest thereon through July 1, 1982 amounts to $1.339 million. Holders of P&NYCRR bonds other than Penn Central (only about $29,000 in toto) are treated as secured creditors under the Plan.

support to LV gave rise to legal rights of some kind which must now be accommodated. In general, there are two possibilities, namely, that Penn Central's advances should be treated as contributions to equity, or that they represent enforceable debt obligations. If they represent debt obligations, they may or may not be distinguishable from similar interline claims of other railroads. Under the holding in *In re Penn Central Trans. Co.*, 486 F.2d 519 (3d Cir. 1973), *cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974), any portion of the interline accounts, whether pre- or post-bankruptcy, stemming from LV's collection of freight charges for shipments handled by the LV and Penn Central constitutes a trust fund claim, which must be paid in cash. Pre-reorganization interline accounts accruing within six months before bankruptcy are entitled to claim the priority of the six-month rule discussed above. And, ordinarily the post-petition portion of the Penn Central interline claim would rank as an administration claim.

In the negotiations which preceded the compromise settlement agreement, it was Penn Central's position that, of its $42.73 million interline claims, approximately $25 million represented trust funds, $539,000 qualified for the six-months priority, $3.6 million should be treated as administration claims, and only $13.3 million should be treated as unsecured.

The LV Trustee was in a position to assert that Penn Central's interline "advances" should be regarded as contributions to equity, under the so-called "Deep Rock" doctrine, or, at least, should be equitably subordinated to the claims of other creditors under the doctrine of *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) and its progeny.

Both sides could find support for their respective contentions in the judicial decisions touching upon these issues, previously rendered in this proceeding. In *In re Lehigh Valley R. R. Co.*, 371 F.Supp. 210 (E.D. Pa.1974), I concluded (1) that the LV Trus-

tee should henceforth pay Penn Central's interline claims on a current basis; (2) that the accrued post-bankruptcy interline claims were entitled to treatment as claims of administration; and (3) that it was preferable, under the Rail Act, to ensure that future decisions concerning governmental subsidization of the respective operations of the two railroads be made on the basis of accurate perceptions concerning the true financial position of each carrier. The Third Circuit Court of Appeals reversed this decision in part, and vacated this Court's Order, in *In re Lehigh Valley R. R. Co.*, 508 F.2d 332 (3d Cir. 1975). The gist of the appellate ruling was that this Court had erred in concluding that the intervention of bankruptcy had rendered the ICC's merger condition No. 14 no longer binding. Thus, the court held, Penn Central was obliged to continue to support LV's operations, at least until September 30, 1974, when, in the view of the appellate court, ". . . it may well be that . . . the obligation to keep the Lehigh Valley operational passed by operation of the Rail Act from the Penn Central's Trustees to the Federal Government." The court left open for later determination in these proceedings [13] all issues concerning the nature and classification of Penn Central's claims.

Immediately after the Court of Appeals' decision was rendered, the parties were invited to advise this Court of their views concerning the desirability of instituting further proceedings before the ICC dealing with merger condition 14 and its implementation, but all concerned agreed that referral of the matter to the ICC would be inappropriate, and that the issues should be resolved by further proceedings in this Court.

In 1978, the LV Trustee commenced litigation in this Court to correct certain alleged inequities in the distribution of past and potential future benefits of LV's NOLs. At that time, LV's reorganization planning contemplated that LV's membership in the

---

**13.** It is now clear that these issues are to be resolved in the present proceedings, notwithstanding the intimation in the Third Circuit's

Opinion to the effect that the Special Court might somehow be involved in the matter.

Penn Central consolidated tax group would end upon consummation of the LV reorganization plan. Some $13.6 million of LV's NOLs had already been utilized to offset income of other members of the Penn Central group, and additional absorptions were in prospect; whereas, upon reorganization and termination of its membership in the consolidated tax group, the LV would have use for these NOLs. The Trustee sought damages in an amount equal to the tax saving which the absorbed NOLs would have generated for the reorganized LV, asserting, alternatively, that Penn Central had been unjustly enriched, and that Penn Central had unfairly dealt with, and adversely affected the interests of, its subsidiary, the LV. After some initial discovery in that litigation, the parties requested that the matter be held in abeyance pending settlement efforts.

The compromise now before the Court is the result of the parties' long and arduous efforts to reach a satisfactory resolution of their various disputes. If the compromise is approved and the Plan consummated, all of the Penn Central's claims will be satisfied in accordance with the provisions of the compromise and Plan, and the LV's NOL litigation will be dismissed.

The settlement is plainly in the best interests of the LV and its other creditors. If any substantial portion of Penn Central's interline claims were required to be paid in cash as trust fund claims, or to be treated as administration expenses, or, indeed, so long as such a possibility remained open, no plan of reorganization for the LV would be practicable, because the cash resources of the LV would be inadequate to provide any significant cash distributions to secured creditors on consummation of the Plan. Under the compromise, however, the only cash distribution to Penn Central, apart from its claims as a bondholder (as to which there has never been any dispute), is the $4 million remaining in the escrow account in

which LV's interline payments to Penn Central were deposited while this Court's Order requiring such payments was pending on appeal.[14] Since these funds were not needed to keep the LV operational, the Trustee could properly have paid this money over to Penn Central at the time, as it turns out. The cash payment to Penn Central pursuant to the Plan does not, in any event, adversely affect the distribution to other creditors.

As the parties appear to recognize, it is clearly in the best interests of all concerned to avoid the expense, risks, and delays which would be involved in any attempt to litigate to finality the status of Penn Central's various claims and LV's NOL contentions.

The proposed treatment of Penn Central's claims is also fair to the stockholders other than Penn Central. If any substantial part of Penn Central's interline claims were to be treated as any kind of debt, the LV estate would be insolvent, and the stockholders would not be entitled to participate at all. Under the Plan, on the other hand, they will be receiving a price of $10 per share, substantially above the market value of the stock when the bankruptcy petition was filed, or at any time since.

The Plan assures the preservation of whatever value may properly be assigned to LV's NOLs. The reorganized LV will remain a part of the Penn Central consolidated tax group for at least five years. Under the control of Penn Central, the NOLs are more likely to have realizable value, than under some other arrangement. By the same token, Penn Central will be responsible for LV's own tax liabilities, if any.

In short, the settlement proposal is fair and reasonable, and will be approved.

### G. *Claims of Secured Creditors*

Earlier versions of the LV Reorganization Plan generated substantial objections from

---

**14.** A total of $4.217 million was deposited in the escrow account while the appeal was pending. This Court authorized various withdrawals aggregating $2.55 million to support LV's continued rail service until the conveyance to ConRail. The remainder, $1.667 million, has generated interest in the interim, so that the balance will be approximately $4 million as of July 1, 1982. The compromise settlement provides that the entire balance as of consummation date will be paid to Penn Central.

four of the indenture trustees representing the bondholders under their respective mortgages. The present Plan meets with the approval of these indenture trustees. It is nevertheless necessary for this Court to evaluate the treatment of secured creditors under the present Plan, applying the "fair and equitable" standard; and this, in turn, necessitates a brief review of the methodology employed in a reorganization process, both in general, and in the peculiar circumstances of this case.

▮ The goal of a reorganization plan is to achieve a correct distribution of the values represented by the reorganized company among the parties entitled to participate, in accordance with their respective entitlements. The absolute priority rule requires that no distribution be made to equity interests until debt claims are satisfied and that no distribution be made to unsecured creditors until the claims of secured creditors have been satisfied. If the assets constituting the security for a particular mortgage, for example, have less value than the amount owed under that mortgage, the claims under that mortgage are only partially secured, and the balance must be treated as an unsecured claim.

▮ In formulating a reorganization plan, therefore, the first step is to establish the reorganization value of the debtor. The next step is to determine the extent to which various claims are secured, and by what assets. The final step is to design and allocate securities of the reorganized company which will appropriately reflect the extent to which the various claimants are entitled to participate.

Because the major part of LV's assets were conveyed to ConRail pursuant to the Rail Act, the value of those assets is to be determined in the Valuation Case litigation. In order to achieve a reorganization plan which could be consummated promptly, without awaiting the final outcome of the Valuation Case, the traditional reorganization methodology could not be followed precisely in this proceeding. It was necessary to design a plan which would be sufficiently flexible to fairly reflect the risks, the benefits, and the timing differentials resulting from the pendency of the Valuation Case litigation. That is, it was necessary to take into account the undeniable fact that claims under some of the mortgages would be entitled to treatment as fully secured claims at one level of recovery in the Valuation Case, but would be only partially secured if the Valuation Case result proved less favorable.

The planning methodology adopted by the LV Trustee to deal with this problem may be summarized as follows: First, the appraised value of all of LV's assets, as of April 1, 1976, was determined. With respect to retained assets, those appraised values were assigned to the respective mortgages secured by such assets. But, since there could be no assurance that the Valuation Case recovery for the conveyed assets would equal their appraised value, it would not have been prudent to simply assign the appraised values of conveyed assets to the respective mortgages. Instead, it was deemed prudent to assume only that the Valuation Case recovery would at least equal the values assigned by USRA in the Final System Plan under the Rail Act, $20.67 million. The Final System Plan figure was then assigned to the various mortgages in the same proportions as would have represented the proper allocation of the LV Trustee's appraisals.[15]

When property subject to mortgage was sold during the course of the reorganization proceeding, the escrowed proceeds from the sales were subject to the respective liens. In assigning the values represented by these escrowed funds to the various mortgages, only the principal, and not the interest earned thereon, was included. Similarly, only the appraised value of real estate was used, without regard to the rental income therefrom.

The asset values assigned to the respective mortgages were then marshalled to determine the amount of the security avail-

15. The LV appraisal of the conveyed assets as of April 1, 1976, was approximately $57 million.

able for each mortgage. These assigned values as of April 1, 1976 were then compared with the amounts of the claims under each mortgage as of that date (*i.e.*, principal plus interest at the contract rate to April 1, 1976) to determine the percentage by which each mortgage should be regarded as secured.

Under the initial security coverage analysis, four mortgages were less than fully secured: Lehigh Valley Terminal Railway, 99%; Lehigh Valley Harbor Terminal Railway, 90%; Lehigh Valley Railroad Consolidated Mortgage, 65%; and Lehigh Valley Railroad General Consolidated Mortgage, 31%. Under the usual reorganization approach, this would have meant that only those percentages of the respective mortgage debts should be treated as secured claims, and the balance as unsecured. But since these percentages were calculated on the assumption that the Valuation Case recovery would be only $20.67 million, whereas in all probability the recovery would exceed that sum, it was decided to treat all of the mortgages as potentially fully secured but to issue First Bonds only for the percentage of the claim corresponding to the security coverage percentage. The balance, or potentially "unsecured" portion, would be recognized by distribution of Second Bonds.

Objections to the 1978 and 1981 Plans filed by the four indenture trustees raised several issues. The various contentions, many of which are discussed in detail in this Court's earlier Interim Opinion, may be summarized as follows: By fixing the allocation of First and Second Bonds on the basis of the security coverage percentage which assumed the $20.67 million "worst-case" outcome of the Valuation Case, the Plan would be totally satisfactory to the indenture trustees only at that level of Valuation Case recovery, or at a level of recovery sufficiently high to assure redemption of all Second Bonds. That is, there are various possible intermediate levels of recovery in the Valuation Case at which the Plan would provide less favorable distributions than if the security coverage percentage had been calculated on the basis of such intermediate Valuation Case recoveries.

Accordingly, the indenture trustees argued that the Plan should provide for conversion of Second Bonds to First Bonds if the Valuation Case recovery were at an intermediate level.

In support of the LV Trustee's approach, it was pointed out that because both the First and Second Bonds have priority over unsecured creditors, the dispute was really over the comparative treatment of the various LV mortgages. The only difference in treatment among the mortgages, however, had to do with the priority of First Bonds over Second Bonds; and that priority, the Trustee asserted, properly reflected the undeniable fact that the value of the retained assets was known, whereas the possible value of the conveyed assets was not. In support of this position, the LV presented its first lien theory and analysis. Each of the mortgages had some assets which were subject to the first lien of the mortgage and each thereby had a percentage of the total amount of LV assets subject to first mortgage liens. The percentages of the cash and First Bonds to be distributed under the Plan to the mortgages corresponded roughly to the percentage of the first lien assets subject to each mortgage. Indeed, the distribution of cash and First Bonds tended to favor the mortgages which were less than fully secured. It followed, the LV Trustee argued, that since these percentages corresponded, the relative treatment of the mortgages was fair: first lien security received recognition by payment in First Bonds and second lien security received Second Bonds.

There were also issues concerning whether certain General Consolidated Mortgage bonds pledged to the Government as collateral security were properly considered in determining the security coverage percentages and in the marshalling process, in view of the fact that, at certain intermediate Valuation Case recovery levels, the Government claims are fully secured without reference to the bonds held as collateral; as to whether interest earned on escrow accounts, and net rents received from mortgaged property, before April 1, 1976, should have been credited to the mortgages in calculating the security coverage percent-

ages (*see In re Penn Central Trans. Co.*, 596 F.2d 1102, 1122–25 (3d Cir. 1979); as to whether post-April 1, 1976 rents should be taken into account, or whether, as argued by the Trustee, the interest component of the Certificates of Value should be regarded as the functional equivalent of post-valuation date rents; and concerning whether mortgages secured by retained assets should be treated more favorably than mortgages secured by conveyed assets, in view of the probable differences in timing of receipt of cash proceeds therefrom.

The compromise which has been agreed to and embodied in the present Plan resolves all of these disputes by adjusting the security coverage percentages of the four mortgages represented by objecting indenture trustees. It is now proposed to assign a 100% security coverage to all of these mortgages except the Lehigh Valley Railroad General Consolidated Mortgage; the coverage percentage of the LVGCM is increased from 31% to 52%. The following table shows the distributions now proposed, in comparison with the original 1981 Plan. The claims are calculated as of July 1, 1982. The top line in each case shows the original proposed distribution, the second line the distribution contemplated by the present Plan:

| | Security Coverage | Cash | First Bonds | Second Bonds |
|---|---|---|---|---|
| | | | | (Dollars in thousands) |
| LVT Rwy | 99% | $ 1,829 | $ 7,318 | 92 |
| | 100 | 1,848 | 7,392 | 0 |
| | + 1% | + 19 | + 74 | –92 |
| LVHT Rwy | 90% | 1,394 | 5,574 | 774 |
| | 100% | 1,548 | 6,194 | 0 |
| | +10% | + 154 | + 620 | –774 |
| LVRRCM | 65% | 399 | 1,595 | 1,074 |
| | 100% | 614 | 2,454 | 0 |
| | +35% | + 215 | + 859 | –1,074 |
| LVRR GCM | 31% | 2,567 | 10,266 | 28,564 |
| | 52% | 4,305 | 17,221 | 19,871 |
| | +21% | + 1,738 | + 6,955 | –8,693 |

I am satisfied that the Plan is fair and equitable. The LVT and LVRRCM mortgages whose security coverage percentage is now increased to 100% would plainly be entitled to that percentage of coverage under even the first lien analysis if the Valuation Case recovery exceeds $26.1 million and as to the LVHT mortgage 100% coverage would result if only about $245,000 in post-conveyance rentals were taken into account, or if the Valuation Case recovery exceeds $33 million, or if pre-valuation date rentals were taken into account. The relative positions of these three mortgages and the General Consolidated Mortgage are properly reflected in the distributions proposed. The compromise solution is well within the range of reasonably foreseeable litigation results, and will therefore be approved.

## VII. SIGNIFICANCE OF THE VALUATION CASE SETTLEMENT

The foregoing discussion demonstrates that the Plan, and the compromises incorporated therein, produce a fair and equitable result if the Valuation Case should continue to be regarded as an unknown quantity. Actually, however, there is every likelihood that the Valuation Case settlement will receive the requisite approvals. Clearly, the Plan should not be approved by this Court unless it would be fair and equitable in the context of the Valuation Case settlement. It is therefore necessary to assume that the

settlement will be carried out, and to evaluate the fairness and feasibility of the Plan on that assumption.

Upon consummation of the Plan, the securities to be issued under the Plan will represent obligations which replace the claims of most, but not all, of the LV's creditors. When the cash proceeds of the Valuation Case settlement become available, the Plan securities will be redeemed for cash. Timing becomes important because of differential interest rates. For example, the $11.442 million in Administrative Notes will bear interest at rates related to that on 10-year treasury obligations, presumably well in excess of 10%. The $82.553 million in Refunding Bonds will bear interest at a rate of 7%. On the other hand, the $47 million settlement amount of the Valuation Case bears interest at 8% from April 1, 1976 to the date of closing.

At this time, of course, the precise dates when the Plan will be consummated and when the Valuation Case proceeds will become available cannot be determined. It is therefore necessary to make certain illustrative assumptions.

Under the Plan, if the consummation date is July 1, 1982, the following distribution of cash and securities would occur:

| | |
|---|---|
| Cash | $37.941 million |
| Series A Administrative Notes | 8.080 million |
| Series B Administrative Notes | 3.362 million |
| First Bonds | 62.678 million |
| Second Bonds | 19.875 million |

If the Valuation Case settlement closing occurs on the same date, it would be possible to combine the issuance and redemption of the Plan securities in a single step, and claimants would be able to receive a single cash distribution. The combined cash requirement would be $131.936 million. An additional $3.206 million in cash would be needed to satisfy unsecured creditors and the public holders of the LV's common stock, and real estate valued at $1.6 million would be conveyed to New Jersey pursuant to its settlement. The grand total would be $136.742 million. Assets available as of July 1, 1982 would include $63.15 million in escrowed cash, the real estate in New Jersey valued at $1.6 million, and the estimated Valuation Case proceeds of $76.032 million, totaling $140.782 million. Upon completion of the distributions, the reorganized company would retain the cash balance of $4.040 million ($140.782 million minus $136.742 million) plus the $700,000 reserved for operating expenses, and would have approximately $1.762 million in net realizable values of retained assets.

Thus, assuming the Plan securities can be redeemed for cash on or about consummation date, and assuming consummation occurs on or about July 1, 1982, the reorganized company would have residual values totaling approximately $6.5 million, together with the benefits, if any, of the LV's tax attributes, including NOLs, after all claims have been satisfied in full. Penn Central's equity interest, as the owner of all of the common stock, would therefore not be worthless. On the other hand, Penn Central would remain liable for LV's federal tax liabilities, if any.

The creditors would have no ground for complaint, since all of their claims would be satisfied in full, and the requirements of the absolute priority rule would have been fulfilled: all claims entitled to be paid in cash would have been paid in cash, and both principal and interest on secured claims would have been paid in full before any distribution to unsecured creditors; and the unsecured claims would have been paid in full before any distribution to equity interests. The outside shareholders whose stock would be cancelled in exchange for $10 per share would receive fair and equitable treatment since, as discussed previously, absent compromise of the Government's claims and Penn Central's compromise agreement not to press for recognition of its interline claims as debt obligations, the shareholders would not be entitled to participate.

Moreover, the reorganized company, and Penn Central as its sole stockholder, would bear the risks associated with any significant delay in receipt of the Valuation Case

proceeds. If those proceeds are not received until after the consummation date, the residual values attributable to the reorganized company would gradually diminish. The Valuation Case settlement bears interest at the rate of 8% until the closing date. This works out to about $506,880 per month. On the other hand, interest on the Refunding Bonds would total $481,551 monthly, and (assuming an 18% rate) interest on the Administrative Notes would total $171,630 monthly, for a total monthly interest expense of $653,181. Thus, each month of delay between consummation of the Plan and receipt of the Valuation Case proceeds (triggering redemption of the Plan securities) would occasion reduction of the remaining cash by some $146,301. Such delay would not jeopardize the rights of any claimant, as a practical matter, since there would be enough cash to redeem all securities in full, even if the delay should extend beyond a full year—an eventuality which is inconceivable if the Valuation Case settlement is indeed approved by the Special Court, the fundamental premise of the present discussion.

Conversely, it is of course true that any delay of the consummation date beyond the date when the Valuation Case proceeds are received would increase the amount of cash remaining after redemption of the Plan securities, since the interest which could be earned by the $75–$76 million proceeds would greatly exceed the contract rate of interest on the claims against the Debtor's estate. However, no significant delay of that kind is anticipated, nor would this Court permit it to occur.

 Accordingly, I am satisfied that, viewed in the context of the settlement of the Valuation Case on the terms proposed, the Plan is fair and equitable.

## VIII. CONCLUSION

The hard work and dedication of generations of its employees enabled the Lehigh Valley Railroad Company to make an important and lasting contribution to the history of railroading in the United States. The same skill and dedication has been manifested by the Trustees, their counsel and staff in the long, difficult, and sometimes frustrating struggle to achieve a successful reorganization. Much credit is due, as well, to the cooperation and hard work of the other parties to the reorganization proceeding, and their representatives. It is a source of gratification that their efforts have now met with success.

### ORDER 760

 AND NOW, this 16th day of April, 1982, upon consideration of the "Revised Amended and Restated Plan of Reorganization Submitted by Robert C. Haldeman, Trustee of the Property of the Lehigh Valley Railroad Company, Debtor, Dated March 5, 1982" (Doc. No. 2515), the Court makes the following findings:

1. The Plan complies with § 77(b) of the Bankruptcy Act.

2. The Plan is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders with no unfair discrimination among classes of creditors or stockholders, conforms to the law regarding participation of various classes of creditors and stockholders, and complies with all of the requirements of law.

3. The Plan is feasible.

4. The Plan makes adequate provision for the payment of allowances, including compensation and reimbursement of expenses as provided in § 77(c)(12); the amount reserved in the Plan for such purposes is in excess of the total amount of claims for such payment which can reasonably be anticipated.

WHEREFORE, IT IS HEREBY ORDERED that:

1. The Plan is APPROVED.

2. Voting on the Plan shall be governed by the provisions of the Voting Order, Order No. 761, entered this date.